**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| Morningstar Fellowship Church, | 0:22-cv-03855-SAL |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| Vs. | Complaint For Religious Discrimination, 42 U.S.C. § 1983, 42 Usc. §1985 (Conspiracy Among Actors To Violate Civil Rights); 42 U.S. § 2000a–1 Prohibition Against Discrimination Required By Any Law, Statute, Ordinance, Regulation, Rule Or Order Of A State Or State Agency, For Common Law Defamation Per Se |
| The Hon. Greg Suskin, Public Information Officer of York County; The Hon. William "Bump" Roddey, York County Council Member; York County, South Carolina; And Various Unknown Defendants, Associated With York County, South Carolina | |
| Defendants. | |

## INTRODUCTION

This is an action brought under both the Federal Civil Rights Act, and specifically, 42 U.S.C. § 1983 and 1985, for religious discrimination and for violation of the plaintiff's Constitutional right of Equal Protection, for a conspiracy among Defendant Greg Suskin and various unknown actors, believed to be officers, employees, and agents of York County South Carolina, for a violation of the South Carolina Tort Claims Act, for common low defamation, and for attorneys fees under 42 U.S.C. § 1988. Under the Court's ancillary jurisdiction over state claims, it is also an action for defamation per se, under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10, *et seq*, and common law defamation per se.

As will be seen, the action swirls around two seminal events which violate federal civil rights law, including (1) a discriminatory email blast containing a press release (Referred to by the County as a "News Release") distributed on March 16th, 2021,

1

containing multiple false statements aimed against MorningStar, designed to undermine MorningStar and it's ministry, distributed by Defendant Gregory Suskin, with the apparent collaboration of other currently unknown defendants, who, upon information and belief, are employees, officers, or agents of York County, and other public statements made by Mr. Suskin, and (2) public comments made by York County Council Member the Honorable William "Bump" Roddey, designed to question and undermine MorningStar's Heritage Tower, which Councilman Roddey knew, or reasonably should have known, is of religious significance to MorningStar and is central to MorningStar's ministry.

Although it is unclear at this point exactly what County employees, agents, or officers were involved in drafting the largely-false press release, upon information belief, appears to have been published by the County's Public InformationOfficer, Mr. Greg Suskin. Also, as will be seen, based upon his own comments and County responses to MorningStar FOIA requests, it does not appear that Mr. Suskin acted alone with regard to the press release, and thus at this point, we have named Various Unknown Defendants associated with York County.

In response to a Freedom of Information Act Request seeking information on who disseminated the press release in question, the County FOIA officer, on March 22, 2022, responded that "The County PIO is responsible for releasing press releases. A copy of that FOIA response is attached hereto as **Exhibit A**.

The press release, sent to approximately twenty-eight (28) media outlets and/or media personalities in the Charlotte metropolitan area, violates the "*subtle departures from neutrality*" standard in matters of religion, as set forth in two seminal religious

liberty cases handed down by the Supreme Court, including *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520, 546 (1993). Id. at 534, and more recently in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. ___ (2018), 138 S. Ct. 1719; 201 L. Ed. 2d 35.

## BACKGROUND

1.     MorningStar Fellowship Church (hereinafter "MorningStar") is an evangelical Christian church and ministry operating primarily in Fort Mill, York County, South Carolina.

2.     MorningStar also has a nonprofit corporation formed under the laws of the State of Mississippi.

3.     MorningStar owns property and operates its ministry headquarters in York County, South Carolina.

4.     The defendant, York County, is a political subdivision of the State of South Carolina.

5.     Upon information and belief, the defendant, the Honorable Greg Suskin, is the Public Information Officer of York County, South Carolina, and has served in that capacity, as a public information officer at all relevant times described in this complaint.

6.     Upon information and belief, the defendant, the Honorable William H. "Bump" Roddey, York County Council Member, is a citizen and resident of York County, South Carolina and is the former chairman of the York County Council, and has served in that capacity, as a member of the York County Council, at all relevant times described in this complaint.

7.  Upon information and belief, there are VARIOUS UNKNOWN DEFENDANTS, ASSOCIATED WITH YORK COUNTY, SOUTH CAROLINA, whose exact identity is yet to be determined, but who, based on public information provided publicly by Defendant the Hon. Greg Suskin, and based upon responses to FOIA requests provided by York County to MorningStar, appear to be members of the York County staff and the York County legal staff.[1]

## JURISDICTION AND VENUE

8.  This is an action for injunctive relief, damages, and punitive damages as appropriate, pursuant to 42 USC § 1983, based upon a violation of the plaintiff's rights under US. Const. amends. I, and XIV.

9.  It is also an action for conspiracy to deprive Plaintiff MorningStar's constitutional rights under the First and Fourteenth Amendments pursuant to 42 USC § 1985, based upon an interview Statement made by the defendant Suskin that other York County actors may be involved, and also based upon York County's response to MorningStar FOIA request submitted March 17th, 2022, suggesting that other County actors may be involved as well.

10.   Additionally, two state causes of action are presented pursuant to the court's authority for pendant jurisdiction over associated state claims, including a cause of action under the South Carolina Tort Claims Act, S.C. Code Annotated

---

[1] It is hoped and anticipated that the names of the additional defendants, who appear in some way to have been involved in the authorship and dissemination of a defamatory press release based at the heart of this matter. Defendant Suskin himself suggested that other individuals may be involved in interviews with the press conducted March 16, 2022, and York County's responses to FOIA requests served by MorningStar suggest that certain, unnamed members of the County's legal staff may be involved. We anticipate that specific names will be revealed upon discovery

4

§15-78-10, et seq, and a claim for common law defamation, in this place defamation per se, seeking punitive damages as may be appropriate.

11. Jurisdiction is proper pursuant to 28 USC §§ 1331 and 1343, based on 42 USC § 1983 and questions of federal constitutional law.

12. Jurisdiction also exists pursuant to 28 USC §§ 2201(a) and 2202.

13. Supplemental (pendant) jurisdiction also exists in this case under 28 U.S. Code § 1367, to allow the court to hear supplemental state claims, particularly under the South Carolina Tort Claims Act, and other common law claims, such as common law defamation, as may be applicable.

14. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in the District of South Carolina.

**FACTUAL BACKGROUND**

15. MorningStar, founded in approximately 1985, is a large, evangelical Christian ministry with its principal headquarters in Fort Mill, South Carolina.

16. MorningStar has both a national and an international ministry that reaches virtually every nation, and MorningStar members and visitors come to visit the Fort Mill campus, annually, from all over the United States. Books published by MorningStar have been bestsellers around the world, and have been translated into over 50 languages.

17. MorningStar also operates an internet protocol television network known as MorningStar TV, and hosts Christian conferences on its properties in Fort Mill

featuring speakers from all over the world and hosting attendees from all over the world.

18. MorningStar's principal evangelical facilities and headquarters in Fort Mill are the same properties that were once owned by a large evangelical ministry known as PTL, and formerly headed by Jim and Tammy Bakker.

19. The PTL Ministry began to subside soon after 1987, when its former founder, Reverend Jim Bakker, resigned from the ministry.

20. Before Rev. Bakker's resignation, PTL had grown to become one of the largest and most well-known ministries in the world, and a pioneer in Christian television as it built and operated an international television network. It also built and operated a large conference center that drew Christians from around the world to its events on its properties in Fort Mill. At that time, upon information and belief, up to six million people visited the property each year, making it the third most popular destination in America after Disney World and Disneyland.

21. From the time of Rev. Bakker's resignation until 2004, the properties that PTL once owned passed through several owners, including the late Reverend Jerry Falwell, of Lynchburg, Virginia, and bankruptcy until the facilities were closed in 1997, and the property remained dormant for seven years.

22. In 2004, several commercial developers divided the old PTL property, and MorningStar purchased the Heritage Grand Hotel and Conference Center, which included the "Tower" and 52 acres.

23. MorningStar purchased the dormant PTL property, through one of its subsequent owners, on September 27, 2004.

24.   Because the property had been dormant for seven years, it needed substantial repair and renovation before any of it could be put to use in MorningStar's ministry.

25.   MorningStar spent about $15 million renovating the Grand Hotel and Conference Center, which it then began to operate as its headquarters and to host its national and international conferences, its K-12 school, and MorningStar University, which has courses for Associate's Degrees through Doctorates in theology and other subjects associated with Christian ministry.

26.   While MorningStar is an evangelical Christian organization and ministry recognized around the world, committed to New Testament Christianity and to the spreading of the Gospel of Jesus Christ, it did not share the same vision for the property as set forth by PTL, but devoted the property mostly to its headquarters operations, to education, and to its church fellowship that it described as a "womb to the tomb" ministry to Christians of all denominational and national backgrounds.

27.   The properties MorningStar acquired from the old PTL property include: 1) The Heritage Grand Hotel and Conference Center; 2) Heritage Court, a development for senior citizens; 3) The Comenius School for Creative Leadership (K-12 school); and 4) The Heritage Tower project designated as a community and ministry for its senior citizens.

7

28.  The only property that had not been completely finished, initially, at the time of Jim Bakker's resignation, was the Heritage Tower, a 21-story partially completed building consisting of 500 plus residential rooms.

29.  The Heritage Tower had originally been dedicated for a Christian evangelical purpose as part of the original PTL Ministry.

30.  Ironically, construction of the Tower originally led in part to Jim Bakker's substantial legal issues, which resulted in the case of *United States vs. Bakker*, prosecuted in the United States district court in Charlotte, in 1989, the Honorable Robert Potter presiding.

31.  The Tower project has been subject to litigation in both state and federal court ever since 2013, with MorningStar seeking to complete the Tower as part of its clear religious vision and Chrisitan values.

32.   The parties reached an agreement whereas all state ligation would cease, when both parties filed the equivalent of a voluntary dismissal in State Court,[2] on July 31st, 2020.

33.   After the mutual dismissal, perhaps the most significant breakthrough in MorningStar's quest to finally complete the Tower came on March 17, 2021, when the State of South Carolina, through its joint Economic Development Authority (JEDA) board, approved a 75-million-dollar bond project for financing to complete the Tower.

34.  MorningStar immediately began to update its engineering studies and architectural studies along with construction plans. MorningStar interviewed

---

[2] Litigation was voluntarily removed from the docket by mutual agreement of MorningStar and York County, by filing under Rule 40(j) of the South Carolina Rules of Civil Procedure, a procedure which the South Carolina appellate courts have described as the functional equivalent of a "dismissal."

several prime contractors and began to work with J.E. Dunn in preliminary selection as prime contractor.

35. Approximately 21 contractors and sub-contractors began to review and examine the building, developing deeply detailed cost analyses and plans.

36. Armed with unanimous approval from the South Carolina Joint Economic Development Authority (JEDA) for its seventy-five million dollar bond inducement, MorningStar began to work with the top financial organizations in the US and selected and retained Haynsworth Sinkler Boyd as their corporate bond counsel. MorningStar retained SIRIS as the in-house construction consultant and selected Ziegler Financial, the country's top underwriter, for its bond project.

37. MorningStar went to great expense in this endeavor, retaining numerous professionals, including architectural and engineering, legal, and financial.

38. As MorningStar hired Haynsworth Sinkler Boyd, the prestigious public bond specialist law firm located out of Columbia and Greenville, they began coordinating directly with Ziegler Financial and MorningStar, ensuring all financial aspects of the bond.

39. As mentioned, MorningStar conducted extensive walk-through construction reviews with at least 21 contractors and sub-contractors, detailing all components of price and scope for the Tower's reconstruction. MorningStar began its pre-marketing campaign, securing over 175 purchase reservations, which were secured by a $1,000 fully refundable deposit.

40. The marketing effort behind the purchase reservations ensured all of MorningStar's residents, constituents, and parishioners, that the lawsuit had been dropped and MorningStar was free and clear to begin developing the Tower.

41. Then, in a complete surprise to not only MorningStar but also to York County's former litigation counsel, Mr. Keith Martens, the York County Attorney, the Hon. Michael Kendree, on August 30th, 2021, filed a motion to restore the litigation to the state docket.

42. The restoration of this litigation effectively killed and ended the entire MorningStar Tower Restoration Project, including all of its gained marketing momentum, detailed and costly financial preparations, and ended the ability for MorningStar to utilize the secured bond issue from JEDA.

**THE LARGELY FALSE PRESS RELEASE OF MARCH 16TH, 2022**

43. On or about March 16, 2022, York County issued a five-page, single-spaced public press release[3] against MorningStar.

44. A copy of the press release of March 16, 2022, is attached hereto as **EXHIBIT B.**

45. As will be seen, the press release cast false aspersions against MorningStar, in several areas.

**False Claims about Status of Litigation**

46. As will be seen, the press release made multiple false representations about the status of certain litigation that MorningStar has been involved in, all in an effort to

---

[3] As previously alluded to, the press release itself is entitled "News Release." But for purposes of this complaint, The terms " news release" and " press release" mean the same.

undermine MorningStar's reputation with its existing residents, the surrounding community, its international audience, and its parishioners and followers. .

**False Claims that MorningStar Lied During a Public Presentation**

47.  The press release also accused MorningStar, basically, of lying during a presentation given by several of its members on February 7th, 2022, again, all in an effort to undermine MorningStar's credibility and MorningStar's reputation with the public and with its parishioners.

48.  As will be seen, false claims against the ministry, essentially accusing the ministry of lying, not once, but three times, is defamation per se, as a Christian Ministry depends upon its truthfulness with the public to engender trust amongst its parishioners.

49.  The County, in its press release, also made the false claim that MorningStar had not been treated any differently from any other developers, amounting to a blatant attempt to undermine the Integrity of MorningStar's ministry.

50.  However, MorningStar has, in fact, been treated differently than other entities in the county that were trying to build facilities or buildings.

51.  The County also ignored its own policy of not commenting upon ongoing litigation matters, as the press release, in and of itself, constituted a violation of the County's own "no comment" policy.

52.  Press release also made false claims that MorningStar had not been treated differently from any other "developer," which, as will be seen, is blatantly false.

53.  As previously alluded to, the press release comes on the heels of a history of litigation between MorningStar and York County over MorningStar's

11

partially-completed Heritage Tower, in state court for York County, which initially lasted from 2013 until 2020, when the parties mutually dismissed their litigation over the Tower under Rule 40(j) of the South Carolina Rules of Civil Procedure, on August 31, 2020. [4]

54. The press release contained numerous inaccuracies, and falsehoods, all libelous and defamatory against MorningStar.

55. As of the date of this filing, the author and/or authors of the press release remain publicly anonymous, nor is it clear who from within the County became involved with its drafting and/or public dissemination and who had final authority for its public dissemination, aside from the Public Information Officer, the defendant, the Honorable Mr. Greg Suskin.

56. Nonetheless, among the most blatant falsehoods disseminated by York County were public claims made by York County that this Honorable Court, and that the United States District Court for the District of South Carolina, had dismissed all previous claims against MorningStar in previous litigation involving the Heritage Tower.

57. Records from both the state and courts incontrovertibly show this claim, that the courts dismissed all previous claims, to be a false claim.

58. These false claims on several crucial points were designed, upon information and belief, to undermine, and destroy MorningStar's ministry by sabotaging and maligning its reputation with the public.

---

[4]

12

59. Among other things, the County's malicious and vindictive press release also falsely claimed that MorningStar had not been treated differently from other "developers," (MorningStar is a primarily church, and not primarily a commercial "developer," as that phrase is commonly used within the building industry) and falsely insinuated that there may be safety issues with MorningStar's Heritage Tower, a baseless claim, for which they have no evidence as the Tower has been certified by top engineers as viable.

60. The County disseminated the false-filled public release, to numerous media outlets, to smear MorningStar, and seems to undermine its religious mission to provide affordable housing to the elderly, through its yet-to-be-completed Heritage Tower. A copy of the largely fraudulent press release of March 16, 2022 is attached hereto, as **EXHIBIT B**.

61. In a partial response to state FOIA request by MorningStar, York County admitted that it emailed the press release in question to the following media outlets and/or members of the media, at the email addresses shown immediately below:

Alicia Eaddy <teaddy@scpublicradio.org>; Andrew Dys - Herald <adys@heraldonline.com>; apcolumbia@ap.org; Assignment Desk - WBTV <assignmentdesk@wbtv.com>; Catherine Welch <CWelch@wfae.org>; Cathrine Muccigrosso - Lake Wylie Pilot <cmuccigrosso@lakewyliepilot.com>; Charlotte Observer <localnews@charlotteobserver.com>; chuguley@bizjournals.com; CN2 - Media email <news@cn2.com>; Fox 46 <newstips@fox46.com>; FOX Carolinas <foxcarolinanews@foxcarolina.com>; Indira Eskieva <ieskieva@wcnc.com>; John Cominsky - WBTV <jcominsky@wbtv.com>; John Marks - Lake `Wylie Pilot <jmarks@lakewyliepilot.com>; Laurabree Monday - CN2 <laurabree.monday@cn2.com>; Lucas Mcfadden - CN2 <lucas.mcfadden@cn2.com>; Manning Kimmel <mkimmel@wrhi.com>; mary king <mking@wbtv.com>; Morgan Newell-WBTV <morgan.newell@wbtv.com>; Pam Henson - York County Magazine <pub@ycmagazine.com>; Spectrum News - Charter Communications (cltnews@charter.com); The Herald's Email

<assignmentdesk@heraldonline.com>; Tina Terry <tina.terry@wsoc-tv.com>; WBT News <wbtnews@wbt.com>; WBTV Web Team <webteam@wbtv.com>; WCCB <newsdesk@wccbcharlotte.com>; WCNC 36 <assignmentdesk@wcnc.com>; Web at WSOC <web@wsoctv.com>; WRHI <newsroom@wrhi.com>; WSOC Channel 9 <assignment@wsoc-tv.com>

62.     Thus, the County blasted the press release out by email to some 28 media outlets and/or media personalities, including all major television stations in the Charlotte area, plus the Charlotte Observer, and major Rock Hill media outlets as well as South Carolina Public Radio.

63.     Individual correspondents receiving the press blast, included, Manning Kimmel of WRHI Radio (Rock Hill), John Cominsky of WBTV (Charlotte), Morgan Newell of WBTV (Charlotte), Lucas Mcfadden of CN2 News (Rock Hill), Laurabree Monday of CN2 News (Rock Hill), Alicia Eaddy of South Carolina Public Radio, Andrew Dys of the Rock Hill Herald, and others as well, as can be seen in the email chain provided by the County, shown immediately above.

64.     Upon information and belief, several outlets published certain allegations made in the press release, including, but not limited to, Fox 46 Charlotte, (Queen City News) with a copy of the publication being attached hereto as **EXHIBIT C.**

65.     Even if these outlets did not publish anything further publicly, the damage caused by the County alerting all of the top media and, upon information and belief, biasing them against MorningStar has massive implications.

### FALSE CLAIMS IN THE PRESS RELEASE
### ABOUT THE STATUS OF STATE LITIGATION

66.     MorningStar immediately began fact-checking the numerous false statements made in the press release.

67. For example, the County's press release falsely claimed not once, but twice, that the state court had dismissed all of MorningStar's claims, Civil Action No. 2013 –CP- 46-00246 (York County Court of Common Pleas) and then claimed the state appeals court upheld those dismissals.

68. On page 2 of 5, at the 4th paragraph from the top of the page, the press release included this specific language. "All MorningStar's claims against York County in the state court lawsuit (referring to Civil Action No. 2013 –CP- 46-00246 (York County Court of Common Pleas) were dismissed and that dismissal was upheld on appeal."

69. But the clear, unambiguous record of the State Court (16th Judicial Circuit of South Carolina) demonstrates the falsity of that claim.

70. Here's the truth: The Honorable Daniel D. Hall, Circuit Court Judge for the 16th Judicial Circuit, did dismiss MorningStar's Claim for Breach of Contract because the court found that it computed damages with sufficient certainty. (Referring to Civil Action No. 2013 –CP- 46-00246 (York County Court of Common Pleas)

71. The claim, made twice, that all of MorningStar's State claims were dismissed by the state court, with the dismissals upheld on appeal, is proved false by a simple review of the Order of Judge Daniel D. Hall signed on November 9, 2015, and entered on November 10, 2015, a copy of which is attached hereto as **Exhibit D**, but the relevant portion which is pasted in below.

## CONCLUSION

IT IS THEREFORE ORDERED that York County's Motion for Entry of Judgment be, and is hereby GRANTED in part and DENIED in part. Judgment shall be entered against Morningstar on its cause of action for breach of contract, but not as to its cause of action for declaratory judgment.

IT IS FURTHER ORDERED that this action is stayed until final disposition of any appeal from this order.

AND IT IS SO ORDERED.

Daniel D. Hall
Resident Judge
Sixteenth Judicial Circuit

York, South Carolina
November 9, 2015

72. As can be seen, it is true that Judge Hall dismissed MorningStar's action for breach of contract, and did so because he concluded he could not calculate damages.

**THE COURT DID NOT DISMISS ALL OF MORNINGSTAR'S CLAIMS, AS THE PRESS RELEASE FALSELY CLAIMED**

73. While MorningStar respectfully disagrees with the Court's (Judge Hall's) decision in that matter, as can be seen even in the screenshot above, *it is absolutely not true that all of MorningStar's claims were dismissed.* (Emphasis added).

74. York County tried to make that happen, that is to have all of MorningStar's cases dismissed, but it failed.

16

75. As can be seen here, in truth, the Court GRANTED York County's Motion to Dismiss in part (dismissing the Breach of Contract action) but *denied* York County's attempt to dismiss MorningStar's claim for a Declaratory Judgment.

76. Note Judge Hall's own words, as quoted above, "judgment shall be entered against MorningStar on its Cause of Action for Breach of Contract, *but not as to its Cause of Action for Declaratory Judgment.* (Emphasis added).

77. So, as can be seen by a plain reading of previous court records in other cases, the press release states that all of MorningStar's claims in state court have been dismissed by a judge, is false.

78. Upon information and belief, it appears that this falsehood is clearly uttered in the press release, authored apparently by known and unknown County representatives, only for the purpose of undermining the credibility of the ministry and undermining the members and congregants of the ministry.

79. For York County to recklessly disseminate false and misleading misinformation to all news and media sources in direct relation to the proximity of MorningStar's community, planned development, congregants, and church services, demonstrates malevolent intent, and shows the utmost in reckless practices, and is far more than a "*subtle departure from neutrality*" standard, as set forth in two seminal religious liberty cases handed down by the Supreme Court, including *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520, 546 (1993). Id. at 534, and more recently in Masterpiece Cakeshop v. Colorado Civil Rights Commission, 584 U.S. ___ (2018), 138 S. Ct. 1719; 201 L. Ed. 2d 35.

80. Thus, Judge Hall did not dismiss MorningStar's Claim for a Declaratory Judgment, as the press release falsely claims. The County tried to get Judge Hall to dismiss that claim for declaratory Judgment but he ruled against the County on the request, and he declined to dismiss that claim.

81. The action for DECLARATORY JUDGMENT, which York County falsely claimed in the press release had been dismissed, represented MorningStar's *very first claim* in the original lawsuit, (Civil Action No. 2013 –CP- 46-00246 - York County Court of Common Pleas) and the Judge did not and has not dismissed it, despite the two falsehoods in the County's press release of March 16th, 2022, claiming that he had dismissed it.

82. These two press release falsehoods about the status of MorningStar's state case, upon information and belief constitute an attempt by a governmental organization, namely York County, which is supposed to be protecting the First Amendment Rights of all citizens, to attack a church, and to attack MorningStar's right of free exercise worship.

83. As we stated, this prevarication concerning the status of the state litigation did not occur just once in that press release, but twice.

84. It is important to note that the opening line of York County's press release said, "York County would like to provide some additional *facts* to County residents regarding its dispute with MorningStar Fellowship Church."

85. York County, in its opening line, stated that all that followed were not claims or opinions, but facts.

86. In this opening line, it also appears that York County proactively initiated this response with malicious intent by stating "York County would like to provide."

87. That press release falsehood (claiming the Court dismissed all of MorningStar's claims) re-emerges in paragraph three, on page 4 of 5, Of the aforementioned press release, when the County falsely states that "**In reality, all MorningStar's claims in the state court action were dismissed by the Court and prior to the Rule 40(j) stipulation. There is no claim by MorningStar that can be reinstated.**"

88. But as demonstrated, from the allegations above, a simple review of the order of Judge Dan K. Hall of November 9, 2015, a copy of which is attached hereto as **Exhibit D**, shows the claims to be false.

**FALSE CLAIMS CONTAINED WITHIN THE PRESS RELEASE ABOUT THE STATUS OF FEDERAL MATTERS**

89. Likewise, in discussing certain federal claims between York County and MorningStar, York County in its press release propagated similarly disingenuous falsehoods about the status of those claims as well.

90. For instance, here is what York County falsely claims, at page 3 of its reckless press release: "**The Court [referring to the federal court] dismissed all causes of action alleged by MorningStar – the totality of its case – after hearing summary judgment arguments. MorningStar has appealed the dismissal to the Fourth Circuit Court of Appeals.**"

**THE FALSEHOOD ABOUT THE STATUS OF THE CASE AGAINST SEN. MICHAEL JOHNSON - FORMER YORK COUNTY CHAIR**

91.    But here is where yet another clear falsehood emerges from York County, about MorningStar, in its press release, this time about the status of federal litigation.

92.    MorningStar also brought a federal action against former County Chair Michael Johnson, who more recently, had issued a public statement arguing his belief that the Tower should be torn down, or words to that effect.

93.    That action against Johnson came under the same case caption along with some of the actions that were actually dismissed by the federal court, namely DOCKET NO.: 0:18-cv-03077-JMC, entitled *MorningStar Fellowship Church vs. York County, South Carolina; James E. Baker; and Houston "Buddy" Motz, and Michael Johnson, DEFENDANTS.*

94.    Thus, even though the court dismissed the actions against Baker and Motz on statute of limitations grounds, contrary to the County's false claims in the press release, the Court had no hearing with regard to Johnson, nor did the federal court decide, one way or the other, to dismiss that action against Johnson.

95.    Johnson had issued a statement while still chair of the County Council, knew or reasonably should have known, that the Tower is part of MorningStar's religious vision, and therefore when he issued a public statement expressing his hope that "cooler heads will prevail, " and the Tower should be torn down, or words to that effect.

96.    Based on Johnson's anti-religious statement, MorningStar brought an action under 42 U.S.C. section 1983, again for religious discrimination based upon his comments from a public official advocating an attack on MorningStar's religious liberty, and its free exercise of religion.

97. York County claimed in its press release that, "The Court (referring to the federal court) dismissed all causes of action alleged by MorningStar – the totality of its case – after hearing summary judgment arguments."

98. Yet, despite the County's claim, the federal court *did not dismiss the case against former chairman Michael Johnson at all,* let alone via summary judgment. And the court did not dismiss the case after hearing summary judgment arguments.

99. In fact, despite the County's inaccurate claim, no summary judgment arguments were ever made in the federal matter against former Chairman Johnson.

100. Instead, MorningStar, relied on what it believed to be good faith by the County to end all litigation in this matter, never believing for a second that the County Attorney would go back one year later and try to reinstitute litigation after the parties had dismissed all state matters, entered into an agreement, on July 31, 2020, with York County to voluntarily dismiss the federal case against Michael Johnson, without prejudice.

101. A screenshot of that Voluntary Dismissal, filed in The United States District Court for the District of South Carolina, Civil Action No. 0:18-cv-03077-JMC, is pasted below.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Morningstar Fellowship Church, | ) | Civil Action No. 0:18-cv-03077-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | STIPULATION OF DISMISSAL AS |
| | ) | TO PLAINTIFF'S REMAINING CLAIMS |
| York County, South Carolina, James E. | ) | AGAINST DEFENDANT JOHNSON |
| Baker and Houston "Buddy" Motz and | ) | |
| Michael Johnson, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

By order filed July 20, 2020, the court dismissed Plaintiff's claims against York County, James E. Baker and Houston "Buddy" Motz. *See* ECF 104. Plaintiff has appealed that order to the Fourth Circuit Court of Appeals. Plaintiff's only remaining claims before this court are Plaintiff's causes of action under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 against Defendant Michael Johnson (the "Remaining Claims").

Pursuant to the provisions of Rule 41(a)(1)(A)(ii) Fed. R. Civ. P., the Plaintiff and Defendant Michael Johnson now stipulate to the dismissal of Plaintiff's Remaining Claims, without prejudice. This filing is not intended to dismiss any other pending matters, including Plaintiff's appeal of this court's July 20, 2020 order (ECF 104) to the Fourth Circuit Court of Appeals.

[SIGNATURES ON FOLLOWING PAGE]

102.  Notice the phrase, "Stipulation of Dismissal," which is not a dismissal by summary judgment, as the press release falsely claims.

103.  But above and beyond all that, the County's claim in the press release that all the federal actions were dismissed by the Court after the Court heard a motion for

summary judgment marks the third falsehood repeated in its press release about the status of other cases.

104. These falsehoods, repeated, are designed to try and undermine MorningStar's credibility, with MorningStar still not having gotten the hearing on the merits about the very vicious attacks from former the County Council chairman and from the former County manager, and how that might affect the County's anti-religious stance against MorningStar even to this day.

105. These falsehoods alone, now repeated 3 times in the press release, should cause the York County Council to take note of its legal staff and to make a change.

106. Extremely concerned about the repetitive falsehoods placed in the press release of March 16th, 2022, MorningStar exercised its legal right to submit a Freedom of Information Act request asking for details as to the authorship and other Communications concerning the sort of the press release.

**PRESS RELEASE VIOLATED THE COUNTY'S
OWN POLICY AGAINST COMMENTING ON LITIGATION MATTERS**

107. At the outset, it should be noted that the press release, the obvious product of a malicious and vindictive vendetta against MorningStar, a Christian Church advocating the Gospel of Jesus Christ, apparently violated the County's own policy not to respond to apparent litigation and/or legal matters.

108. The Hon. Christi Cox, District 5 Representative and York County Council chairwoman, revealed the County's "we don't comment on litigation" policy, at the Your County Council meeting on February 7th, 2022.

109. Chairwoman Cox explained the County's policy on commenting on litigation, on February 7, 2022, just before remarks made by MorningStar Vice President David Yarnes.

110. The Chairwoman's comments, which will be highlighted below, can be found on the York County public YouTube Site, beginning at approximately the 2:34:48 mark.

111. The website showing those comments can be found here. https://www.youtube.com/watch?v=Q555AaTCsCg&list=PLeOvO6HPjP5meBaqrUjBQZkz7WlW8conW&index=26

112. On the video, moments before MorningStar Vice President Dave Yarnes' presentation to the Council began, at about the 2:36:06 mark, Council Chairwoman, the Honorable Christi Cox said, "No one's allowed to respond," or words to that effect, meaning, upon information and belief, that the Council members or other County officials by County policy aren't allowed to respond to our presentation concerns about the status of litigation.

113. Then, at the 2:36:18 mark, Chairwoman Cox goes on to say, "Just to be clear, on advice of legal .. *County Council does not comment on ongoing litigation matters, and allow that to go through the court."*

114. Thus, the Honorable Chairwoman reemphasizes the clear County policy, that is, not to comment publicly on litigation or legal matters.

**York County Reaffirms its "No Comment Policy" in FOIA Response**

115. In addition to the Chairwoman revealing the "No Comment" policy on litigation matters, the County' reaffirmed its "no comment" policy on litigation matters, in response to MorningStar's FOIA request.

116. On March 17th, 2022, the date after the County published its press release, MorningStar submitted a Freedom of Information Act (FOIA) to York County requesting certain information related to the fraudulent press release of March 16th, 2022. A screenshot of one of the requests for information concerning the source of the press release, even from public comments, is shown below:

3. In a televised interview posted on Fox News Charlotte, Channel 46, a local television station in Charlotte North Carolina on March 16, 2022, a County employee identified as Greg Suskin, who has been identified on the County website as York County "Public Information Officer," made the following statements in an interview to reporter Derek Dellinger of Fox 46, or words to this effect:

> "Typically with pending litigation, it's not something we generally speak about. But, with the public comments that have been made, our county staff, our legal team, thought that it was appropriate to, sort of remind people where this has been, where it started, where it is now .... To this day, MorningStar has not presented an application for a building permit to do this work."

> For your convenience, a link to the interview can be found at this site: https://www.fox46.com/news/u-s/york-county/patently-false-york-county-leaders-address-dispute-over-heritage-tower-delays/

> Please provide a copy of all specific "public comments that have been made" that Mr. Suskin is referring to in his interview referenced above, which necessitated the need to issue the press release in question.

117.   Although it did not respond substantively, York County provided the following information in response to request number three, requesting comments made by the Defendant Gregory Suskin - providing only a vague link to many York County meetings on the "York County Website," as shown below, but did not provide any substantive answer at all, and did not provide or cite even one alleged "public comment" that Suskin claimed to have been made:

The information requested in 3A can be found on the York County website by accessing the recordings of the County Council meetings. Meeting Videos | York, SC (yorkcountygov.com)

118.   Nevertheless, as will be seen, and upon information and belief, the County apparently harbored such animosity toward MorningStar that it did not apply this policy in a neutral manner towards religion.

119.   Rather, and as will be seen, they deliberately violated its "we don't comment" policy to place MorningStar, a religious organization, in a negative manner, in a way that it did not apply the policy against others, and in fact violated the "no comment" policy, purposely, to demonstrate public hostility towards religion.

120.   The County's actions in misapplying its own "no comment" policy, by making an exception for MorningStar and by targeting MorningStar directly, in a manner by disseminating the largely-false release, constitute a widespread and mean-spirited, malicious attempt to smear and defame MorningStar across the boards, in a vicious manner, violating the neutrality standard regarding matters of religion as set forth by the United States Supreme Court, and furthermore, as will be seen, violates MorningStar's constitutionally-protected right to Equal Protection under the law.

121.   The County's violation of its own "no comment policy," launching a vicious

defamatory, and false-filled press release shows hostility toward religion that

does not show neutrality.

## FALSE CLAIMS IN THE PRESS RELEASE THAT MORNINGSTAR ENGAGED IN A "FALSEHOOD" AND A "PATENT" FALSEHOOD[5].

122.   MorningStar is a church, advocating the Gospel of Jesus Christ.

123.   As such, its reputation for truthfulness within the community and even outside the

community and around the world is critical.

124.   York County and its officials, including Defendant Mr. Suskin, are constitutionally

bound to support the Constitution of the United States, including the First

Amendment of the United States Constitution

125.   Yet despite all this, in a manner that is not only false and inaccurate, but that is in

fact, downright malicious, York County at one point, falsely accused MorningStar

of a falsehood, and at another point, accused MorningStar of a "patent"

falsehood.

126.   Both of these accusations came on page 4 of 5 of the press release.

### The False Representation about December 9, 2021

127.    The first accusation came in paragraph four on page 4 of 5, which read as

follows, with a screenshot of a paragraph shown below:

---

[5] To be precise, as will be shown below, the phrase used by the County in its press release is "Patently False." The description in the header of this section or perhaps other places as a "patent falsehood" are meant to refer, specifically to the description used by York County at page 4 of 5, paragraph 6 of its press release of March 16, 2022.

27

4. In the presentation, MorningStar alleged that the County "re-petitioned the court to reinstate [the lawsuit]" after December 9, 2021. That is false. The Court granted the County's motion on January 19, 2022, but the County's only motion to restore was filed August 30, 2021.

128. The County, however, has its facts mixed up and used this as an excuse to make a false allegation against MorningStar, to make the church look incompetent.

129. Let us review what really happened in this instance, which can be verified by a review of the videotape from the County's public YouTube page, which can be found here.

**https://www.youtube.com/watch?v=Q555AaTCsCg&list=PLeOvO6HPjP5me BaqrUjBQZkz7WlW8conW&index=25**

130. Here are the real facts.

131. MorningStar Vice President David Yarnes is making a presentation to the County Council, in fact, just moments after the County Chairwoman, Christy Cox, had stated the County's policy of not commenting on litigation.

132. Mr. Yarnes' comments start at approximately the 2:36 38 mark of the County's YouTube video.

133. During the course of his presentation, Mr, Yarnes presented to the County Council a brief chronology of the case through a PowerPoint presentation.

134. Mr. Yarnes did in fact make a reference to the date of December 9, 2021, but not as the County claimed.

135. *Mr. Yarnes did not say, as the County falsely claimed in its press release*, that "The County repetitioned to reinstate the lawsuit on December 9th, 2021."

136. Actually, the only reference to December 9 came at 2:39:42 of the video, during Mr. Yarnes' PowerPoint presentation, which Yarnes presented before the Council, came within a screenshot of the PowerPoint mentioning December 9th exactly as follows:



137. The PowerPoint references November 9th and December 9th, as dates in which MorningStar sent letters to York County in an effort to "de-escalate litigation."

138. On this point, the County invented an imaginary statement, attributed it to MorningStar, and then claimed the statement was "false."

139.  Moreover, even if Mr. Yarnes or someone else had inadvertently made the claim that the County claimed MorningStar made, (That the County petitioned to have the action reinstated on December 9th) and there is no evidence of that happened, the facts are clear from the PowerPoint that on December 9th,

29

MorningStar reached out to the County, in an effort to deescalate litigation in the matter.

140. MorningStar never claimed, as the press release falsely accuses MorningStar of claiming, that the County "repetitioned" the Court on "December 9th".

141. The County, essentially, by its press release, invented an opportunity to call MorningStar a liar, "jumped the gun," and made up its own statement, so it could falsely attribute the statement to MorningStar, and then accuse MorningStar of lying about having made a statement it (MorningStar) never made, claiming that MorningStar made a "false" statement.

142. Therefore, within paragraph 4 of the press release, the County launches two lies against MorningStar; (1) the County-concocted claim that MorningStar claimed in its presentation that the County re-petitioned the court to reinstate after December 9 - when MorningStar said no such thing, and (2) the claim that the County-concocted statement, falsely attributed to MorningStar was "false."

143. This double-barrel falsehood leveled against MorningStar in paragraph 4 is designed to make MorningStar, a church of Jesus Christ, look like a liar, and to cast aspersions upon its religious integrity, and the religious integrity of its members.

144. The County appears to have simply made this up in an attempt to smear MorningStar to the press and the public to make it appear that MorningStar is a group of liars.

145. Unfortunately, the County's attempt to smear MorningStar does not stop there.

146.    We see another smear attempt 2 paragraphs below, at Paragraph 6 of the press release, on page 4 of 5, as shown immediately below:

> 6. In the presentation, and as part of a public hearing, MorningStar told County Council that it had submitted a request to the County in August 2017 for "repairs and beautification" of the Tower and that the County precluded MorningStar from "attempts to remodel or repair the façade or develop the facility, in short condemning the Tower to further decay." <u>This is patently false</u>. MorningStar's "building permit application" was submitted August 17, 2017, on the wrong form, as it was not for building maintenance.[13] It was for "Removal of wall finishes, floor finishes and fixtures, never in service and general removal of debris in preparation for building restoration at future date." This is not a maintenance request and had nothing to do with repairs to

147.    The phrase "patently false" has an even stronger negative connotation than the phrase "false" as used in the paragraphs above in the press release.

148.    In other words, the word "false," standing alone, proved insufficient for the County in this case, but instead, the County first placed the word "patently' preceding the word "false," to further its attack against MorningStar.

149.    According to the Cambridge Dictionary online, the word "patently" means, " in a way that is clear."[6]

150.    Synonyms for the word patently include, "clearly, manifestly, obviously, and plainly."

151.     Thus, when the County violates its own policy against commenting on ongoing litigation, and accuses its litigation opponent in a press release of something that is "patently" false, the County is claiming, in essence, that there is no room for any type of reasonable interpretation of Mr. Yarnes' comments.

152.    In fact, Mr. Yarnes was commenting upon a 2017 building permit the County arbitrarily denied, and presented his comments to the County Council in the

---

[6] Cambridge dictionary online, definition of patently - https://dictionary.cambridge.org/us/dictionary/english/patently

31

PowerPoint as shown below, which can be found at the 2:41:04 mark on the County's YouTube Page:



153.    First off, it should be noted that Mr. Yarnes' PowerPoint does not quote from the building permit request itself, but rather, *quotes from the County's denial of the building permit* request.

154.    Even more deceiving, is that press release takes Mr. Yarnes'[7] comments out of context.

155.    In examining Mr. Yarnes' exact language before the Council, *which is recorded on video*, the County's accusation that his comments were "patently false" is even more absurd.

156.    Here's what Mr. Yarnes says, exactly to the Council, none of which is revealed in the mean-spirited press release.

---

[7] The Press Release does not mention Mr. Yarnes' name, per se, but only attributes the remarks to MorningStar. However, Mr. Yarnes was the only MorningStar representative to address this point, specifically.

157. First, Mr. Yarnes asks, rhetorically, at 2:41:02, "Could we have done more to beautify it?"

158. Two seconds later, he answers his own rhetorical question at the 2:41:04 mark by saying, "No. We put a petition in, we put a building permit in to change the outside, and your planning department said, 'no restorative activities could be done for that building, and there was absolutely no way for us to restore it further.'"

159. Of course, the exact comments as quoted above are not found in the press release, either directly or in context.

### County/Suskin Distorting context as a ruse for applying the "Patently False" label

160. The full text of Mr. Yarnes' comments is deliberately withheld, upon information and belief, in an effort by the County and Defendant Suskin, to hide the truthful context of the comments, and apply a misleading spin on the comments in the press release.

161. By dicing Mr. Yarnes' comments and not placing them fully in context, it is clear that York County is just looking for an excuse to sloppily apply the "patently false" narrative in its press release, all in an effort to smear MorningStar, its ministry, and effectively diminish MorningStar and its members' right of free exercise of religion.

162. It's clear that Mr. Yarnes is responding to the broad and absolute definitive statement from York County that "no restorative activities are authorized for this building." York County's failure to include that it had denied MorningStar any and

all restorative activities, in fact shutting MorningStar down from any further attempts to re-file or broaden their request, causes a destructive diversion.

163. Even still, Mr. Yarnes' summarization before the County Council of the building permit request is accurate and truthful, not "patently false," as the press release falsely claims.

164. Secondly, the County knows exactly the precise language of the building permit request submitted in 2017.

165. Therefore, Mr. Yarnes' characterization of the building permit certainly could not realistically be construed to be any sort of misrepresentation to the County, because the County already had a copy of the building permit request, and had in fact acted upon the request, and had in fact denied the building permit request,

166. Third, MorningStar submitted the 2017 building permit request, in part, to "remove debris."[8]

167. In fact, the precise language within that building permit request includes the following" (1) "general removal of debris in preparation for building restoration," and furthermore, (2) to "remove wall finishes, floor finishes, and fixtures never in service."

168. A screenshot of the request is as follows:

---

[8] The County acknowledges this correctly in one portion of the press release, that the building permit application was submitted in part to "remove debris."

**PLAN TYPE:**

☐ Existing building with interior additions (upfit)
☐ New building with completed interior
☐ Electrical/mechanical/plumbing plan submittal only

☐ New building with no interior additions (shell)
☐ Exterior addition to existing building

☒ Other: REMOVAL OF WALL FINISHES, FLOOR FINISHES & FIXTURES : NEVER IN SERVICE

Description of proposed work: & GENERAL REMOVAL OF DEBRIS IN PREPERATION FOR BUILDING RESTORATION. AT FUTURE DATE.

169. Clearly, in his comments, Mr. Yarnes accurately characterized the essence of the denied building permit request, which requested, in part, the opportunity to clean up "debris" from the property.

170. Cleaning up debris and removing debris, and even removing old wall finishes, floor finishes, and fixtures never in service is an act of beautification.

171. Also Mr. Yarnes in his spoken comments to Council, on this point, as shown above, said, in part, "We put a petition in, we put a building permit in to change the outside."

172. In fact, Mr. Yarnes was referring to the outside wall of the building, under which some brick has been removed from the facade.

173. This is factually consistent with the building permit request itself, which, as the County points out in the defamatory press release, includes the phrase "removal of wall finishes" and "removal of debris."

174. Mr. Yarnes did not intend to quote the exact language of the building permit request that had been submitted, because the County already had that exact language of the building permit request, and in fact, the County quoted some of that language in the fraudulent press release.

35

175.   Mr. Yarnes, in his comments to Council, characterized the effect of what the limited building permit would have allowed MorningStar to accomplish, had it been granted, mainly to remove debris, which would be an act of beatification, and minor repairs which may have been consistent with removable that debris, and work on "wall finishes."

176.   Thus Mr. Yarnes's comments, referring to "change the outside," meaning the exterior walls, and/or removal of any debris which may have been outside the building, are consistent with the language and the spirit of the building permit request

177.   By slicing the context, dicing Mr. Yarnes' words, and characterizing these comments as "patently false," the County, and Mr. Suskin, are engaged in a misconstruction of the truth and demonstrating further evidence of the County's attempt to bash MorningStar and its religious mission.

178.   But in response, and violating its own "no comment policy," the County chose to characterize Mr. Yarnes' attempt to paraphrase an accurate summarization of what the permit would have accomplished as something that is "patently false."

179.   In other words, in this particular characterization of "patently false", the County is claiming- falsely -- that there are no circumstances under which any aspect of Mr. Yarnes' comments could have been considered truthful.

180.   Mr. Yarnes' presentation was fully truthful.

181.   Yet, the "patently false" smear within the press release marked yet another attempt by Suskin and the County, and Unnamed Defendants whose actual

identity is yet to be determined, to slam MorningStar,d its Ministry, and its credibility with the public, and to cast its religious beliefs in a negative light.

182.   Under no circumstances can Mr. Yarnes' attempt to characterize the essence of the building permit be realistically characterized as something that is "patently false," as the County falsely characterized it.

### The "HOLY WAR" Smear

183.   One of the most outrageous attempts to smear MorningStar comes on the final page of the press release, in which York County directly implies, and falsely so, that MorningStar has somehow referred to its dispute with York County as a "Holy War."

184.   A screenshot of that allegation as set forth below:

> MorningStar's attempts to characterize its dispute with the County as a "holy war" related to religious liberty and government oppression are a distraction from the real issue and the facts related to the Tower.  Since 2006, when it became the owner of the property on which the Tower sits, MorningStar has <u>never</u> submitted a building permit application and plans showing that the Tower itself can be completed in accordance with applicable building codes and standards.

185.   Note the clear quotation marks around the phrase "holy war," and the County's claims that MorningStar has attempted to characterize its dispute with the County using that phrase.

186.   First off, this is a false claim and false allegation that MorningStar has ever characterized its dispute with the County as a "holy war."

187.   MorningStar challenged the County on the use of this phrase, "holy war," through the FOIA request of March 17, 2022, submitted the day after the press release came out.

37

188.    In other words, MorningStar challenged the County to produce anything that it had in its possession showing that anyone from MorningStar had ever used the phrase " holy war."

189.    This challenge came at Line Item 21 of that FOIA request, which provided as follows:

**Line Item #21 of the FOIA Request:**
**Request for Copies of Records, Further Demonstrating**
**The Falsity of the Press Release Claim that MorningStar Attempted**
**to Characterize its Dispute with the County as a "Holy War."**

190.    In its press release, York County made a claim that MorningStar had attempted to characterize the dispute with the County as a "Holy War."

191.    Exercising its right under the Freedom of Information Act, MorningStar sought documentation concerning the documentation supporting this "Holy War" claim, made by the County, and wrote the FOIA request in the following manner:

21. On page 5 of your press release, you claim that "MorningStar's attempt to characterize this dispute with the county as a 'holy war' related to religious liberty and governmental oppression or distraction from the real issue and the facts related to the Tower."

We note that you specifically place quotation marks around the phrase "holy war," suggesting that you were attempting to quote a MorningStar official or representative using that phrase, "holy war."

To this extent, please provide copies of any documentation in which you attribute such a phrase, that is, specifically, "holy war," and that combination did any official, representative, Pastor, a staff member, attorney, or anyone else representing or associated with MorningStar Fellowship Church.

192.    MorningStar is entitled to this information, if it exists.

38

193. Yet, incredibly, once again, the County dodged its responsibility to comply, by again citing its canned "attorney-client" privilege array of excuses for noncompliance.

194. In response to MorningStar's FOIA request, the County gave the following excuse in dodging that request for information on the "Holy War" attribution.:

> Your twenty-first request for information is exempt from disclosure under FOIA and is protected by the attorney-client privilege and work product, and is subject to ongoing litigation, and/or does not exist; therefore, the request is denied

In other words, the County claims that MorningStar used the phrase "holy war" in its press release, and even puts quotation marks around "holy war," but refuses to provide any documentation showing any evidence that MorningStar used such a phrase, and hides behind the "attorney-client privilege and work product," even though the County waived those privileges by publishing the so-called "attorney-client privilege and work product," to potentially millions of persons (third parties) via the press release.

195. But in fairness to the County on this point, at least their response to that FOIA request was partially correct, when they stated, "and/or does not exist."

196. Of course, the evidence does not exist, because the County's "holy war" claim in the press release is a lie to begin with.

197. Yet, the County has made a false accusation here, again, all in a hostile attempt to demean and diminish MorningStar and its Ministry in the eyes of the public.

198. Consider, for instance, the definition of the phrase "Holy War," as set forth by Merriam-Webster dictionary online, which is as follows: "a war or violent

campaign waged often by religious extremists for what is considered to be a holy purpose." [9]

199. MorningStar views the term "Holy War," as applied within the context of the press release, as deeply offensive and egregious and considered it analogous to a racial slur.

200. The false claim in the press release that MorningStar has claimed that it wants a "holy war," or words to that effect, is extremely defamatory to MorningStar's constituents, residents, parishioners, and supporters and could cause irreparable harm to the church and its reputation.

201. This "holy war" lie is an over-the-top, hostile, and defamatory smear against the church, by York County, which demonstrates a hostility toward religion that does not show neutrality.

202. Mr. Suskin, and perhaps other County Officers, who are constitutionally charged with protecting religious liberty, are stating, essentially, by use of the phrase, "holy war," that members of a local church are "extremists" and about to enter into literal war or a violent campaign.

203. To make matters worse, Mr. Suskin and perhaps other County officials, deliberately and maliciously used the phrase, "holy war," *and even put quotation marks around it*, attributing it to MorningStar, without one shred of evidence that anyone at MorningStar has ever characterized its legal arguments with the County in that matter.

---

[9] Merriam-Webster Online, definition of "HolyWar" found here:
https://www.merriam-webster.com/dictionary/holy%20war

40

204.  We note that the defendants did not use the phrase "legal war,[10]" but rather, went for a more dramatic, negatively-connotated description in choosing the phrase "holy war."

205.  The phrase "holy war," takes on an entirely different and more sinister context under these circumstances in this country today.

206.  The phrase, "holy war," having been falsely attributed to MorningStar, can hardly be characterized as being religiously neutral, but instead represents deliberately-chosen, highly-inflammatory phraseology, written maliciously in the Press release by the County, by Unnamed Defendants whose actual identity is yet to be determined, and published by Suskin, all in an effort to make MorningStar look as bad as possible in the eyes of the public.

207.  The false accusation and phrase are not only outright defamatory, but are a disrespectful swipe against a Christian church, disrespectful callousness to the time-honored concept of freedom of religion, in the free exercise of religion, as set forth in the First Amendment of the United States Constitution.

**OUTLETS PUBLISHED THE DEFAMATORY PRESS RELEASE**

208.  Unfortunately, the County's Smear attempts appear to have worked, as at least one outlet, Fox 46 Charlotte (Queen City News) picked up and republished the phrase "Patently False," which was part of York County's vicious attempt through the press release to smear MorningStar and its Ministry as the County obviously hoped that prestigious news outlets such as Queen City News would pick up and republish the County's false smears to the public.

---

[10] To be clear, MorningStar never used the phrase "legal war," either. The point being, that rather than characterizing in a non-neutral manner, the county chose inflammatory, non-neutral language.

41

209.   A copy of the Queen City News is shown below, and the link itself is pasted

below.



https://www.qcnews.com/news/u-s/york-County/patently-false-york-County-leaders-a

ddress-dispute-over-heritage-Tower-delays/

210.   Because the County disseminated the press release to multiple media outlets,

the York County Times Facebook Page, via Fox 46, Charlotte, also published the

"patently false" smear, as shown in the screenshot below:



https://www.facebook.com/yorkCountytimescommunity/posts/d41d8cd9/1365139883

992938/

211.   Other portions of the press release were, upon information and belief, published

by other media Outlets, including, but not limited to, WBTV of Charlotte,[11] The

Rock Hill Herald,[12] WSOC (ABC Affiliate) of Charlotte,[13] and perhaps others as

well.

**YORK COUNTY AND THE REMAINING DEFENDANTS WERE WELL AWARE OF THE RELIGIOUS SIGNIFICANCE OF THE HERITAGE TOWER PROJECT TO MORNINGSTAR, BUT ENGAGED IN A SMEAR CAMPAIGN ANYWAY**

---

[11] https://www.wbtv.com/2022/03/17/york-County-claims-heritage-Tower-should-have-come-down-2013/

[12] Upon information and belief, the Rock Hill Herald ran an article on March 17, 2022, but a link cannot be provided because the Herald has a pay-only subscription service for accessing articles online.

[13] https://www.wsoctv.com/news/local/legal-battle-continues-over-old-heritage-usa-Tower-fort-mill/QSLLB7E4CVC73OP72XGH6ZJZQU/

212.   York County knew from previous litigation, and Mr. Yarnes reminded Councilman Roddey, once again, at the Council meeting in question, that MorningStar considers restoration of the Tower as part of its religious mandate.

213.   Mr. Yarnes again made this clear in its presentation to the Council, as can clearly be seen in the County's own YouTube channel at approximately the 2:40:15 mark, in a screenshot shown below, wherein it is stated that "MorningStar considers restoration of Heritage Tower as part of its religious mandate to Honor and care for its senior community."

214.   A screenshot from the County's YouTube page, under which Mr. Yarnes again re-emphasize is the religious Mission wrapped around the restoration of the Heritage Tower:



215.   Despite being made aware of this religious mandate, once again, the County responded in this vicious, reckless and irresponsible matter by accusing MorningStar of falsehoods and making false claims about the status of litigation,

all in an effort, upon information and belief, to undermine and attack

MorningStar's religious Mission within the community.

**YORK COUNTY, IN ITS PRESS RELEASE,
FALSELY CLAIMED MORNINGSTAR
HAS NEVER BEEN TREATED DIFFERENTLY THAN OTHERS**

216.   Unfortunately, the anti-religious, press release barrage against MorningStar, did

not end with the "holy war" smear, nor with the false claims about the status of

previous litigation, nor with the false claims that MorningStar's presentation was

either "false" or "patently false."

217.   The County continued to press in with other false claims as well, all to smear

MorningStar and its religious mission.

218.   For example, the County falsely claimed in the press release that MorningStar

has never been treated differently from other "developers."

219.   This allegation comes on page 3 of 5 of the press release, at the bottom of the

page when the County makes the following statement:

> MorningStar has never presented any evidence that York County has treated
> MorningStar differently than other developers of commercial property.

220.   With respect, this is an outlandish statement which may be the most significant

prevarication in the entire press release.

221.   Aside from the fact that MorningStar has publicly and repeatedly dedicated the

Heritage Tower to religious use, and is not a commercial property, the County's

disparate treatment against MorningStar has surfaced in several significant

areas.

45

## DISPARATE TREATMENT UNDER THE DEVELOPMENT AGREEMENT

222. One way in which the County treated MorningStar differently involves the County's scheme to force MorningStar into a so-called "Development Agreement."

223. When MorningStar began their quest to complete the Heritage Tower, back in 2008, York County insisted that it be subject to a draconian contract known as a "Development Agreement"[14] under the South Carolina Development Agreement Act.

224. At that time, no one else had ever been subjected to a "development agreement" as a prerequisite to engaging in construction on the property.

225. From FOIA request responses, MorningStar has learned that only two other development agreements have ever been foisted upon other Developers, both in 2013.

226. Since then, no developer and certainly no church has ever been subjected to having to enter into a development agreement as a prerequisite to either building or completing any type of building project.

227. As pointed out, no church has ever been required by York County, in the history of York County, to enter into such an agreement.

228. Moreover, of the three development agreements which York County entered into, two with billion-dollar commercial developers, only MorningStar's development agreement contained a "demolition clause," demanded by the County, seeking to take or destroy the property of the other party.

---

[14] The "Development Agreement" expired by its own terms, and by operation of law in 2013. Yet, York County acts as if it is still in force.

229. Put another way, the two billion-dollar commercial developers were not required to have demolition clauses within their development agreements, nor were they required to have any other type of clauses within their agreements which would allow the County to take property away from them under certain circumstances.

230. The County only subjected MorningStar to a clause, that the County would require the destruction of property.

231. Upon information and belief, hundreds if not thousands of properties have been developed in York County before and after 2008, yet MorningStar is the only church that has ever been required to enter into such an agreement, and the only party which has ever been required to enter into the agreement with a demolition clause, and only one of three entities ever having been subject to such an agreement.

232. In this regard, The County's claim in the press release that MorningStar had not been treated differently from any other developer, is false

**DISPARATE TREATMENT UNDER THE BUILDING PERMIT REQUEST OF 2017**

233. Another way in which MorningStar has been treated differently is in *the County's response to the limited building permit request submitted by MorningStar in 2017.* (Emphasis added).

234. As will be seen, The County simply invented excuses, seemingly on the fly, for denying the building permit requests, which upon information and belief, have never been used with anyone else as an excuse to deny a building permit request.

47

235.   Both the County, in its press release, and MorningStar, in its presentation to the County Council on February 7th of 2022, have alluded to the 2017 building permit requests, submitted by MorningStar, which the County denied.

236.   A screenshot of the County's denial under the 2017 Building Permit Request is set forth below:



**Review Comments**

The following comments are grouped as "Review Comments" or "Advisory Comments". "Review Comments" are items related to your plan review that require action on your part. "Advisory Comments" are informational notes that may be important in the future and are for your information.

Building & Codes - Larry Harrison - larry.harrison@yorkcountygov.com                    Not Approved

*Review Comments:*

"No restoration activities are authorized for this building, and in light of the ongoing litigation, the violation of the Planned Development (PD) Plan adopted by York County Council on January 10, 2005, and default under the May 5, 2008 Development Agreement, the permit application is denied."

237.   As can be seen, the County cites three reasons for the denial of the request, as set forth below.

238.   Upon information and belief, none of the reasons have ever been used or applied against any other person or entity seeking a construction permit.

### The "Ongoing Litigation" Disparity

239.   For example, one of the three reasons that York County cited in denying the 2017 building permit application was, in the words of the County, "in light of ongoing litigation" as a reason for denial.

240. However, and upon information and belief, York County has never used this "in light of ongoing litigation" excuse with any other party seeking an application for a building permit.[15]

241. Moreover, and upon information and belief, the County has no basis in law, pursuant to any code, state or regulation to cite "ongoing litigation" as a valid excuse for denying a building permit.

242. In this way, despite the false assertion in the press release that MorningStar had not been "treated differently" from others, MorningStar has in fact been treated differently.

### The "In Violation of a Planned Development Plan" Disparity

243. The second of the three reasons that York County cited in denying the 2017 building permit application was "In Violation of a Planned Development Plan" as a reason for denial.

244. However, and upon information and belief, York County has never used this "In Violation of a Planned Development Plan" excuse with any other party seeking an application for a building permit.[16]

245. Moreover, and upon information and belief, the County has no basis in law, under any code, statute, or regulation to cite "In Violation of a Planned Development Plan" as a valid excuse for denying a building permit.

---

[15] In its FOIA request of March 17, 2022, MorningStar sought documentation of other denied building permit requests citing "ongoing litigation" as a basis for denial. York County produced no such other documents, alternatively citing the attorney-client privilege and/or that the documentation "does not exist."

[16] In its FOIA request of March 17, 2022, MorningStar sought documentation of other denied building permit requests citing "In Violation of a Planned Development Plan" as a basis for denial. York County produced no such other documents, alternatively citing the attorney-client privilege and/or that the documentation "does not exist."

246. In this way, despite the false assertion in the press release that MorningStar had not been "treated differently" from others, *MorningStar has been treated differently.*

### The "Because of a Default" Disparity

247.  A second of the three reasons that York County cited in denying the 2017 building permit application was, "because of a default."

248. However, and upon information and belief, York County has never used this "Because of a Default" excuse with any other party seeking an application for a building permit.[17]

249. Moreover, and upon information and belief, the County has no basis in law, pursuant to any code, state or regulation to cite "Because of a Default" as a valid excuse for denying a building permit.

250. In this way, despite the false assertion in the press release that MorningStar had not been "treated differently" from others, MorningStar has in fact been treated differently.

251. Thus, and despite of the false claim in the press release that MorningStar had never been treated any differently than others, or words to that effect, the fact is that it had been treated differently in at least two material respects, one regarding the County's insistence upon the development agreement, and the second based upon the never-before-used phrases in a response to a building request, all show that MorningStar has in fact been treated differently from others by York County.

### The Commenting Upon Litigation Disparity

---

[17] In its FOIA request of March 17, 2022, MorningStar sought documentation of other denied building permit requests citing "In Violation of a Planned Development Plan" as a basis for denial. York County produced no such other documents, alternatively citing the attorney-client privilege and/or that the documentation "does not exist."

252. Then, we come to the County's stated policy against commenting upon ongoing litigation, which marks yet another way in which the County treated MorningStar differently, contradicting yet another false claim by the County, Suskin, and various Unknown Defendants in the press release.

253. Chairwoman Cox publicly emphasized this "we don't comment" policy, during the public County Council meeting on February 7, 2022.

254. As shown above, the County also reiterated its no-comment policy in response to MorningStar's FOIA request of March 17th, 2022.

255. Even in public comments to the media, on March 16th, 2022, the date that the County disseminated the fraudulent press release, the defendant Greg Suskin essentially admitted that MorningStar is being treated differently by virtue of the fact that the County, in MorningStar's case, would comment upon ongoing litigation, in violation of its own policy.

256. An interview with Queen City News, the defendant Suskin is quoted as follows:[18]

Typically with pending litigation, it's not something we generally speak about," said Greg Suskin, public information officer for York County. "But with the public comments, we felt it was appropriate to show how it started, where it's going, and where it is now."

257. Therefore, Defendant Suskin himself admits, even in the course of the interview, that MorningStar is being treated differently in this instance, by the County breaking its own "no comment" policy, thus contradicting that claim in the press release that MorningStar has not been treated any differently from others, is untrue, in a further attempt to smear MorningStar and its ministry.

---

[18] Queen City News, March 16, 2022.
https://www.qcnews.com/news/local-news/new-phase-in-the-fight-of-decaying-heritage-Tower/?ipid=promo-link-block1

258. The press release came from the county not in response to any provocative statement that had been made by MorningStar, but as a wanton and malicious act that has been unprovoked.

### The "They Haven't Presented a Building Permit" Lie

259. Above and beyond the contents of the false press release, the County, in its zeal to bash MorningStar, in its deliberate departure from any semblance of neutrality on religion, publishes yet another lie in the public arena against MorningStar,

260. That lie, purveyed by Suskin and the County, is the notion that MorningStar has not requested any permits at all during the entire process.

### Defendant Suskin's Interview with Queen City News

261. Let us examine the defendant Suskin's own language in his interview with Queen City News, again, published on March 16th, 2022, and also shown on video.

262. This regard, Suskin is quoted as saying, "To this day, MorningStar has not presented a building permit to do this work, to York County."

263. That claim is designed to undermine MorningStar and its ministry, by insinuating that MorningStar has done nothing in terms of submitting paperwork to attempt to begin construction on the project.

264. This insinuation by Suskin is untrue and is in fact contradicted by the press release itself which admits that MorningStar submitted a building permit request in 2017, but that the County denied the request for work under the permit application.

265. On page 4, paragraph six of the press release, Suskin and the County claimed that "*MorningStar's 'building permit application' was submitted August 17, 2017,*

52

*on the wrong form, as it was not for building maintenance. It was for Removal of wall finishes, floor finishes and fixtures, never in service and general removal of debris in preparation for building restoration at a future date.*"

266. Thus, the County admits in the press release that MorningStar submitted a building permit application, contradicting Defendant Suskin's false claim that "To this day, MorningStar has not presented a building permit to do this work, to York County."

267. Then the County, in the press release claims, after admitting that MorningStar submitted the building permit application, claims it was "on the wrong form."

268. The County's "It was on the wrong form" claim had never surfaced, either publicly or privately, until the claim surfaced for the first time in the press release.

269. And of course, MorningStar would note that when it submitted the building permit request in 2017, the three reasons for denying the request - were (1) "in light of ongoing litigation," (2) because of a "default" and (3) in violation of a Planned Development plan" - stated nothing about the building permit request being on a "wrong form."

270. The only reasons for denying the building permit were the three cited reasons as set forth above, and the "wrong form" ruse never came up.

271. Put another way, York County at the time treated the form submitted by MorningStar as an acceptable form, but denied that building permit for other manufactured reasons.

272. The County never said anything about the permit request being on the "wrong form," prior to the publication of the press release.

273. The false "wrong form" ruse, obviously, is yet another effort by the County to attack MorningStar and make it look incompetent as if it cannot even apply for a building permit on the right form, all part of an overall effort to attack Morningstar and undermine its Ministry.

274. The newly-minted "wrong form" excuse is yet another attempt to take a shot at MorningStar, its ministry, and its members, by falsely suggesting a degree of incompetence and lack of diligence in the building process.

275. Therefore, defendant Suskin's false claim that MorningStar never submitted a building permit request is contradicted by the County's own press release, and the County press release claiming that the building permit request submitted on " the wrong form" is contradicted by its 2017 denial of the building permit request, accepting the format as a proper form, never claiming the form was improper, but inventing other reasons for denying the request, which of course, MorningStar contends are legally improper reasons.

276. A screenshot of page 1 of the building application is shown below:

54



**YorkCounty**
south carolina

**PLANNING & DEVELOPMENT SERVICES**
1070 HECKLE BLVD, SUITE 107, ROCK HILL, SC 29732
PHONE (803) 909-7200 / FAX (803) 909-7227

**COMMERCIAL BUILDING PLAN REVIEW APPLICATION**

- This application is for building plan review only.
- Once plans are approved, a permit application is required to start the permit process.
- Permit applications require 1 to 2 days for processing.

Project name: _MFC 21 STORY TOWER_    Date submitted: _8/17/17_

Project address: _375 STARLIGHT DRIVE, FORT MILL, S.C. 29715_

Project #: _____    Tax Map #: _____

**PLAN TYPE:**

| | |
|---|---|
| ☐ Existing building with interior additions (upfit) | ☐ New building with no interior additions (shell) |
| ☐ New building with completed interior | ☐ Exterior addition to existing building |
| ☐ Electrical/mechanical/plumbing plan submittal only | |

☒ Other: _REMOVAL OF WALL FINISHES, FLOOR FINISHES & FIXTURES; NEVER IN SERVICE_

Description of proposed work: _& GENERAL REMOVAL OF DEBRIS IN PREPERATION_
_FOR BUILDING RESTORATION AT FUTURE DATE._

**PROJECT COORDINATOR INFORMATION:**

Company: _MORNINGSTAR MINISTRIES_    Contact: _PHIL LUTZ_

Address: _375 STARLIGHT DRIVE, FORT MILL, S.C. 29715_

Phone: _352-638-3258_    Email: _PLUTZ@MORNINGSTARMINISTRIES.ORG_

**PROPERTY OWNER INFORMATION:**

Name & address: _DAVE YARNES, 375 STARLIGHT DRIVE, FORT MILL, S.C. 29715_

Phone: _803-802-5544 EXT. 229_    Email: _DYARNES@MORNINGSTARMINISTRIES.ORG_

277.    Mr. Suskin's false narrative is clearly designed to make it appear that

MorningStar has been twiddling its thumbs, so to speak, and has not submitted

any permit request at all.

55

278.    What Mr. Suskin fails to state is that in response to that permit application, York County Responded that the application was "not approved," and further stated that "No restoration activities are authorized from this building."

279.    A copy of that denial of the permit application is shown below. Note the absence of the phrase "wrong form" in the reasons for denial, under the section entitled "Review Comments."

**Review Comments**

The following comments are grouped as "Review Comments" or "Advisory Comments". "Review Comments" are items related to your plan review that require action on your part. "Advisory Comments" are informational notes that may be important in the future and are for your information.

**Building & Codes - Larry Harrison - larry.harrison@yorkcountygov.com**                    **Not Approved**

*Review Comments:*

"No restoration activities are authorized for this building, and in light of the ongoing litigation, the violation of the Planned Development (PD) Plan adopted by York County Council on January 10, 2005, and default under the May 5, 2008 Development Agreement, the permit application is denied."

280.    As can be seen, this declaration, that "no restoration activities are authorized for this building in light of ongoing litigation," etc, came from Larry Harrison, of the York County Building and Codes Department.

281.    In other words, York County, by that statement -- that "no restoration activities are authorized for this building in light of ongoing litigation," etc, is essentially saying that they will not even consider building permits at all, because the County denied the 2017 application, with the blank statement that no work will be permitted in any way, or words to that effect.

282.    Moreover, Defendant Suskin and York County failed to reveal the truth to the public that York County had placed a so-called "default" on the property back in

2010, and the County took the position that because of that "default" a building permit would not be granted.

283.   In fact, the County even cites this so-called "default" in its response to MorningStar, as one of the reasons for not allowing a building permit.

284.    Mr. Suskin's false narrative tries to make it appear that MorningStar's request for a building permit all those years might have done some good, when in fact, the County has blocked even considering building permits by maintaining a nebulous "default" status, under a development agreement, which in fact, expired by its own terms and by operation of law in 2013.

285.   Even though the "default"[19] has now expired, York County still cited the "default" as a reason for denying building permits, and with regard to MorningStar, has taken a blanket position that it will deny all building permits related to Heritage Tower.

286.   This is all a sleight-of-hand attempt to mislead the public into believing that MorningStar never applied for a permit - when in fact it did apply for a permit - without revealing to the public that the County would never have tolerated permits with its "no restoration is allowed for this property" position.

287.    Not only did MorningStar submit a building permit request, but defendant Suskin failed to point out that in 2009, MorningStar had submitted a very comprehensive site development plan for the County, a plan for which it spent several hundred thousand dollars as an initial step toward building the property.

_____

[19] To be clear, MorningStar contests the validity of the so-called "default," contends that the County illegally and prematurely declared the "default,", and without York County having an adequate legal basis for declaring such a "default."

57

288.    In an effort to convey an inaccurate and incomplete story to the public, Suskin also fails to point out from his comments that the State of South Carolina had approved a 40 million-dollar bond project to fund completion of the Tower in the spring of 2021, just a few months before York County again initiated litigation, which effectively killed a bond project altogether, stalling any realistic effort for continued construction, once again.

289.    Suskin's false claim that no permit was requested, when MorningStar requested a permit, and further implying or insinuating that applying for a building permit might have been granted in the face of the County's "default" claim, are all aimed at attacking MorningStar's ministry and undermining MorningStar's credibility in the eyes of the public, by half-truths and lies, an effort to falsely make it appear that MorningStar has not taken meaningful steps towards the completion of the project, all, in violation of the Free Exercise Clause of the First Amendment.

290.    The fact is that York County, through its own actions, litigation and otherwise, has effectively stopped MorningStar from proceeding with the project.

291.    Ignoring all that, however, the County published a combination of false comments by Suskin, in the false press release, and through other means to disingenuously point the finger at MorningStar for the project being stalled, when in fact, the County is to blame for the project being stalled.

## THE COUNTY'S EFFORT TO SYSTEMATICALLY UNDERMINE THE HERITAGE TOWER IN THE EYES OF THE PUBLIC

292.    Beginning the evening of February 7th, 2022, shortly after MorningStar made its presentation to the York County Council, as referenced above.

293. In an apparent systematic attempt to undermine the Tower in the minds of the public by disingenuously raising issues such as "safety, health and welfare," York County dropped this phrase ("safety, health and welfare") twice in its press release, first at paragraph 1,[20] and then, again, at paragraph 6.[21]

294. Upon information and belief, these phrases were calculatingly dropped into the press release, to raise questions in the absence of evidence of safety issues, to undermine MorningStar's sacred Tower in the eyes of the public.

295. As will be further demonstrated, County representatives have manifested an absolute lack of neutrality toward religion, demonstrating a lack of sensibility, and a callousness towards MorningStar, all while knowing that the Tower is of precious religious significance to MorningStar.

### "BONES IN THE BUILDING"

### COUNCILMAN BUMP RODDEY

296. York County Councilman Bump Roddey, *in an interview approximately 5 weeks before publication of the press release*, on or about February 7th, 2022 with Correspondent Dereck Dellinger with Fox News 46 of Charlotte, York County appeared to signal that they would make "safety, health and welfare," an issue, without any evidence suggesting that the Tower has "safety, health and welfare,"

---

[20] At paragraph 1 of the fraudulent Press Release, on page 4 of 5, York County concluded, sanctimoniously, " All York County has asked from MorningStar is that it do so in the same manner required of any other developer in a similar situation in order to ensure the safety, health, and welfare of citizens and residents," - as if there is some documented legitimate issue of "safety, health and welfare" surrounding the Tower.

[21] At paragraph 6 of the fraudulent Press Release, on page 4 of 5, York County again concluded, sanctimoniously, "The County has a duty to the health, safety, and welfare of its citizens and simply cannot allow a 35-year-old building that has never been completed to stand in its current condition. In fact, the York County code mandates that the County take action to address abandoned, uninhabited, and decaying structures like the Tower," - as if there is some documented legitimate issue of "safety, health and welfare" surrounding the Tower, and as if this Tower has been somehow "abandoned" by MorningStar - a notion which is an absolute lie.

issues at all, or in the alternative, issues that could be solved if the County would simply issue building permits to solve them.

297. Through Roddey's comments, and when meshed with the fraudulent press release published five weeks later, it became clear that the County intended to raise an "age" issue with the Tower as an excuse to suggest, without any evidence, that there might be safety, health, or welfare issues.[22]

298.  In his interview with Mr. Dellenger, Councilman Roddey admitted that, "The steel in the ground is worth millions of dollars."

299. Roddey went on to say, "There are some 'bones' there, but the question is whether those 'bones' are good enough for what the County would require if it was coming out of the ground today."

300. So Councilman Roddey, speaking of a building with an important religious significance to MorningStar Fellowship Church, derogatorily refers to it as having "bones" within it.

301. In other words, in this interview some 5 weeks before the County submitted the press to 28 approximately media outlets, the Councilman seems to raise some sort of fathom "safety" issue, wondering aloud if the "bones" (a derogatory reference to a religious site) would be "good enough" for what the County would require if it was coming out of the ground today."

302. In fact, and upon information and belief, the Councilman's "bones" in the building comments appear to serve dual-faceted purposes in attacking the tower: (1) to suggest that the interior construction perhaps raises a phantom "safety, health

---

[22] As will be seen, the Tower, which was largely constructed in 1987, is still relatively young in comparison to other buildings in York County, buildings which are not the object of County-engineered press release raising issues of "safety, health and welfare."

and welfare" issue, because he says there are "bones" inside, and (2) to basically insult MorningStar and its members and follower, by using degrading language about a structure that Roddey knew, or reasonably should have known, is considered sacred to MorningStar.

303. When something is considered religiously sacred, as the Heritage Tower is to Morningstar, it is an affront to the First Amendment to have elected officials insult it by proclaiming that there are "bones" inside.

304. Moreover, the Councilman's comments are disingenuous, because the Heritage Tower is already "out of the ground," standing 21 stories in the air, to be precise, has been constructed, largely completed on the exterior, and now needs the construction to be finished.

305. So, this is not an issue of building the Tower from scratch according to today's standards as the Councilman would suggest.

306. Moreover, we know that Councilman Roddey does not express concern about numerous other buildings in York County that are well over a hundred years old, and still standing, and still operational, which may not be "good enough" for what the County would require" if those buildings were coming out of the ground today.

307. Some of these other buildings in York County are in fact relatively ancient by American Standards, including the Anderson house and the Allison house, both built in the 18th Century, with the Allison house being built even before the start of the American Civil War.

308. Roddey expresses no concern about "bones" being in buildings that were constructed over a hundred years before the Tower.

309. That is because this is really not about "safety, health, and welfare," or even the age of a building.

310. It is about religious discrimination against Morningstar, and this is the only reason for the public double standard to explain the attack against MorningStar is constantly attacked by the county and by County Representatives.

311. Yet, despite Councilman Roddey ruminating about "bones" in the building that may not be good enough, and despite the County pointing out of the Tower was first constructed only thirty-five years ago, trying to project the impression that the property is so old that it is now "decaying," above and beyond the normal, in reality, the lifespan of the Tower is still relatively young compared to other buildings, something that the County has failed to mention in its press release..

312. As will be seen, the Allison House was built in York County in 1860, while the Tower construction did not begin until approximately 1987, some 127 years after the Allison house.

313. Moreover, and upon information and belief, Councilman Roddey knew, or should have known that MorningStar considers the Heritage Tower essential to its religious mission.

314. His unfortunate decision to refer to it as having "bones," is not only an apparent attempt to undermine the Integrity of the Tower in the eyes of the public, it also demonstrates an unfortunate lack of judgment that does not demonstrate religious neutrality, and, unfortunately demonstrates an insensitive hostility toward religious people, who are Christians.

315.  In the Bible, the concept of bones is often associated with defeat, oppression, or death.

316.  See, for example, Numbers 24:8, Isaiah 30:18, Jeremiah 50:17, Lamentations 3:4, Daniel 6: 24, and Micah 3: 2-3.

317.  The famed "Vision of the Valley of Dry Bones" is a prophecy in chapter 37 of the Book of Ezekiel, depicting the whole house of Israel, like unburied skeletons, in a state of living death.

318.  Councilman Roddey knew, or upon information and belief, reasonably should have known that MorningStar Fellowship Church considers the Heritage Tower to be something that is sacred, and it is essential to its religious ministry.

319.  His choice of and use of "bones," to describe the Tower, unfortunately, is an apparent attempt to undermine the Tower itself, obviously, to portray to the public a picture of decay, and worthlessness about something that has clear religious significance to MorningStar.

320.  Roddey should know better because MorningStar previously sued both the County and former County Chairman Michael Johnson for making publicly insensitive comments, but then dismissed that lawsuit in 2020 upon the belief the litigation would end between MorningStar and York County.

321.  And in that particular lawsuit against York County, MorningStar made it clear that the Heritage Tower is of religious significance to their ministry.

322.  For example, in the previous lawsuit, DOCKET NO.: 0:18-cv-03077-JMC, at paragraph 120, MorningStar proclaimed:

This Heritage Tower is not simply another piece of real estate. *It contains …*

*religious significance to MorningStar and its members and its worship.*

(Emphasis added by the use of italics).

323.    At paragraph 204 of that same complaint, MorningStar declared:

The County answered and counterclaimed, seeking to have MorningStar

destroy the Tower, *a building of considerable unique and independent religious*

*significance to MorningStar.* (Emphasis added by the use of italics).

324.    At paragraph 204 of that same complaint, MorningStar declared:

…the Tower, *a property of sacred religious significance and central to*

*MorningStar's worship experiences.* (Emphasis added by the use of italics).

325.    At paragraph 304 of that same complaint, MorningStar declared:

Even though *completion of construction of the Tower is significant to*

*MorningStar's religious vision*, the County refused MorningStar's continued

attempts to work out differences through negotiations, and still refused to remove

its position of a "default" from the development agreement that expired five years

ago. (Emphasis added by the use of italics).

326.    At paragraph 343 of that same complaint, MorningStar declared:

York County by employing language in its development agreement which takes

away property, to take away and destroy *a building belonging to MorningStar*

*church that has significant religious meaning*… (Emphasis added by the use of

italics).

327. At paragraph 357 of that same complaint, MorningStar, in describing the Tower, use the phrase;

……*a building owned by MorningStar with independent religious significance*…(Emphasis added by the use of italics).

328. In Paragraph 7, of its prayer for a federal declaratory judgment, MorningStar used the phrase, in describing the Tower;

…. a nearly complete Tower that currently sits on his property, *which is considered by the church to be a building of sacred significance, and which will be used as a valuable instrument of worship,....*(Emphasis added by the use of italics).

## MORNINGSTAR HAS DECLARED THAT COMPLETING THE TOWER IS AN "ACT OF WORSHIP"

329. Not only that, but in the previously-referenced lawsuit, in at least twenty (20) different places, MorningStar repeatedly stated that completing the Tower is an "act of worship," flowing from a biblical mandate, and an "act of worship to the Lord," and an "act of worship for the glory of God. [23]

330. As MorningStar pointed out in paragraph 62 of its previously-filed complaint for religious discrimination, and in other places that "several examples from the Bible demonstrate where building and worship coincided are as follows: (1) God ordered the Israelites through Moses to build the first tabernacle of God in the wilderness after they had left Egypt[24]; (2) King David built a tabernacle for the Ark

---

[23] See, e.g MorningStar Fellowship Church v. York County, South Carolina; James E. Baker; and Houston "Buddy" Motz, U.S. District Court, Rock Hill Division, DOCKET NO.: 0:18-cv-03077-JMC - paragraphs 53, 59, 60, 61, 63, 64, 77, 110, 125, 143, 165, 287, 308, 339, etc.
[24] Exodus Chapters 25-31 and 35-50.

of the Covenant;[25] and (3) his son, King Solomon built the first temple in Jerusalem,[26] and (4) years later,(5) Nehemiah rebuilt the walls of Jerusalem,[27] Ezra the rebuilt temple[28]. All of these, and others, were done in obedience to God.[29]

331.    All in all, the Bible contains some 55 verses about building, under which the Lord orders his people to build.

332.     These verses include, but are not limited to the following; Genesis 11 3, 1st Kings 5:17, Haggai 1 8, Exodus 27:1, 1st Kings 6: 9, 2nd Chronicles 2:3, Isaiah 54: 11 , 1st Kings 5:18, Exodus 36: 1, 1st Kings 6: 7, 2nd Kings 12:11, 2nd Kings 22: 5-6, 1st Chronicles 22: 12-2, 1st Kings: 16 24, Genesis 4:17, Judges 1:26, 1st Chronicles 11: 8, 1st Kings 6: 2, 1st Kings 8:13, Ezra 3:10, Joshua 8: 30-31, Genesis 8:20, Moses 24:4, 2nd Samuel 24: 25, 2nd Samuel 5: 11, 1st Kings 3: 1, 1st Kings 7: 2, Hosea 8:14, Psalm 51: 18, Nehemiah 2: 17 -18, Micah 7: 11, Genesis 11: 4-5.[30]

333.    At paragraph 63 of the previously-filed complaint, MorningStar placed the county, and Councilman Roddey on notice that, "MorningStar likewise, believes that the completion of the Heritage Tower falls along those lines, and that the church is mandated to complete it as an act of worship for the glory of God, and also to

---

[25] 2nd Samuel 6:17
[26] 1 Kings 5–6
[27] Nehemiah 1:1 - 1:10
[28] Ezra 1:1-6:22

[29] The Ezra and Nehemiah examples were not included in the first complaint, but have been added here for additional illustrative purposes showing the occasional biblical conjunction of construction, obedience and worship.
[30] https://bible.knowing-jesus.com/topics/Building

serve as an instrument of God as part of its free exercise of religion under the First Amendment of the United States Constitution.

334. MorningStar also cited various biblical references In the previous complaint, beginning at paragraph 65 of that complaint, which was served upon the County, which supports its heartfelt belief that both completing the Tower, and caring for the elderly, which is the purpose of the Tower, is part of its religious call.

### Verses on Caring for the Elderly as an Act of Obedience/Worship

335. The verses cited by MorningStar included the following:

    a. **Proverbs 23:22 ESV:** Listen to your father who gave your life, and do not despise your mother when she is old.

    b. **1 Timothy 5:4 ESV:** But if a widow has children or grandchildren, let them first learn to show godliness to their own household and to make some return to their parents, for this is pleasing in the sight of God.

    c. **Ephesians 6:2 ESV:** Honor your father and mother (this is the first commandment with a promise).

    d. **Isaiah 46:4 ESV:** Even to your old age I am he, and to gray hairs I will carry you. I have made, and I will bear; I will carry and will save

    e. .**Proverbs 16:31 ESV:** Gray hair is a crown of glory; it is gained in a righteous life.

    f. **Leviticus 19:32 ESV:** You shall stand up before the gray head and honor the face of an old man, and you shall fear your God: I am the Lord.

g. **1 Timothy 5:1-2 ESV:** Do not rebuke an older man but encourage him as you would a father, younger men as brothers, older women as mothers, younger women as sisters, in all purity.

h. **Exodus 20:12 ESV:** Honor your father and your mother, that your days may be long in the land that the Lord your God is giving you.

336. MorningStar stands by all those declarations, that the Heritage Tower remains a building of sacred religious significance, a part of its ministry call, and that completion of the Tower is indeed "act of worship," flowing from a biblical mandate, and an "act of worship to the Lord," and an "act of worship for the glory of God.

337. Councilman Roddey served on the County Council when time previous lawsuit, that is lawsuit number DOCKET NO.: 0:18-cv-03077-JMC, was filed,

338. Thus, Roddey, of all people, knew or should have known from that lawsuit that MorningStar considers the Tower to be religiously significant, and precious to MorningStar's sacred call to worship.

**Councilman Roddey was Present and Heard MorningStar's Presentation to Council of February 7, 2022**

339. Councilman Roddey also should have known about the Tower's religious significance to MorningStar because only moments before he made the "bones" comments, he attended the February 7th presentation by certain MorningStar members, including vice president David Yarnes, who made it clear the restoration of the Tower is inextricably linked with MorningStar's religious vision, as referenced above and shown below:

68



340.   And by the way, Councilman Roddey attended that County Council meeting when Mr. Yarnes re-emphasized that the Tower is part of MorningStar's "religious mandate," as shown in the screenshot above, sitting second from the far right, listening to Mr. Yarnes' presentation in real time.

341.   Despite all of this, knowing full well how religiously significant the Tower is to MorningStar, Roddey insensitively and callously, and upon information and belief, to undermine something in the eyes of the public that is sacred to MorningStar, described the Tower as having "some bones."

342.   Knowing all this, Roddey's description shows a callousness, a hostility towards religious people and certainly does not comport with the standards of religious neutrality as set forth by the Supreme Court in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 585 US ___ (2018), and violates the Free Exercise Clause of the First Amendment of the United States Constitution.

**The "PUBLIC SAFETY HEALTH & WELFARE" RUSE**

343. In a further effort to undermine MorningStar and its Ministry, York County has consistently raised or attempted to raise a false notion with the public that the heritage Tower presents a "safety issue," even though the County has absolutely no evidence to suggest there are any such issues with safety, health, or welfare.

344. We see this emerge, in part, in the press release of March 16, 2022, approximately five weeks after Roddey's "bones in the Tower" remarks, in two separate sections.

345. The County's first reference to this phantom "Safety, Health, and Welfare" issue comes at the top of page four, at the end of paragraph 1 of the press release, when the County, through Defendant Suskin states,

"All York County has asked from MorningStar is that it do so in the same manner required of any other developer in a similar situation in order to *ensure the safety, health, and welfare* of citizens and residents."

346. Then, we see the phrase revived again at page five, at the bottom of paragraph 6, of the press release, where the County goes even further with his ruse by stating that,

"The County has a duty to the health, safety, and welfare of its citizens and simply cannot allow a 35-year-old building that has never been completed to stand in its current condition. In fact, the York County code mandates that the County take action to address abandoned, uninhabited, and decaying structures like the Tower. York County will continue to carry out that duty to the best of its ability and in accordance with applicable law."

347. In response to paragraph 4 of the press release, it is not true that York County has "asked from MorningStar is that it do so in the same manner required of any other developer in a similar situation in order to *ensure the safety, health, and welfare* of citizens and residents."

70

348. The County has never raised any credible or serious concerns about *safety, health, and welfare* of citizens and residents, with regard to the Tower, in large part because there is no evidence of any such concern.

349. Therefore, not only is the claim in the press release an attempt to raise false concerns in the minds of the public, without evidence, of safety, health, and welfare issues concerning the Tower, but the claim itself is simply untrue (the claim that these issues have been raised with MorningStar) -- yet another falsehood by the County in a press release violating its own policy against commenting about ongoing litigation.

350. The County has used a number of revolving, ever-changing, excuses to deny MorningStar's religious liberty and right to worship in completing its Tower.

351. It has, for example, made the claim that MorningStar "cannot get the funding," or it has made the false claim, as seen here, that "no permits have been applied for," or words to that effect.

352. But it has never specifically challenged MorningStar on any health or safety issue, because the fact is, that the County has no evidence at all that the Heritage Tower poses any health or safety issue to anyone.

353. Moreover, the County's claim that the Tower is "abandoned" and "decaying" is false at worst, and materially misleading at best.

354. First off, the Tower has not been abandoned by MorningStar.

355. Not only does MorningStar keep 24-hour surveillance at the Tower,[31] specifically to help ensure the safety, health and welfare of all concerned, but MorningStar

---

[31] MorningStar has round the clock security patrolling the Tower, 24 hours a day, and also maintains constant video surveillance of the Tower.

has actively sought to attempt to refurbish it, by, among other things; (1) petitioning the state of South Carolina for a multimillion-dollar bond referendum, approved in 2021; (2) by submitting the building request permit in 2017 which was denied by the County, and (3) by submitting a very detailed site development plan and by constantly conveying to County officials its desire to complete and finish the building.

356. These activities are not the hallmark of an "abandoned property," refuting the County's false claim in its press release that the building has been abandoned.

357.  Moreover, the Tower is located on MorningStar's property, right beside the church.

358. This is not some situation where someone has abandoned the property and gone off and left it alone, not cutting the grass, and allowing nuisance situations to develop.

359.  The property has not been abandoned, and the County's claim within its press release is simply a fabrication designed to attack MorningStar, its ministry, and to undermine its stated desire to complete the Tower is part of its religious calling.

360.  Moreover, the notion that the Tower is "decaying," as suggested by the press release, is also misleading.

361. The truth is, that every building ever built, from the moment of its construction, engages in "decay" to one degree or another.

362. The County, in its press release, implies that because the Tower is 35 years old, that it is subject to some sort of extraordinary "decay" without any evidence that decay is any more than normal.

363.  To address the County's attempt to raise an "age" issue, the 61-story Bank of America, in downtown Charlotte, was constructed in 1992, just five years after the Tower, in 1987.[32]

364.  Thus, both the Heritage Tower and the Bank of America tower are relatively contemporaries in age, built in the same decade within five years of one another.

365.  New York City's famed 101 story Empire State Building was constructed in 1930 - 1931, some 57 years before the Tower.[33]

366.   The fact of the matter is that there are many, many buildings in York County that are much older than the Heritage Tower.

367.  The South Carolina Department of Archives and History, State historic preservation office, maintains a list of a number of suchholder buildings, and publishes the list online for public review, at the website displayed below: http://www.nationalregister.sc.gov/york/nryork.htm

368.  Among these still-standing buildings include the Allison house, constructed in 1860,[34] The Anderson house, constructed in 1898,[35] The South Carolina National Guard Armory building, constructed in 1938,[36] The United States Courthouse and Post Office Building in Rock Hill, constructed in 1931,[37] The Peoples National Bank building in Rock Hill, constructed in 1909,[38] The old York County courthouse building, located prominently at the intersection of Liberty and Congress streets in York, constructed before the United States entered World

---

[32] https://en.wikipedia.org/wiki/Bank_of_America_Corporate_Center
[33] https://en.wikipedia.org/wiki/Empire_State_Building
[34] http://www.nationalregister.sc.gov/york/S10817746012/index.htm
[35] http://www.nationalregister.sc.gov/york/S10817746016/index.htm
[36] http://www.nationalregister.sc.gov/york/S10817746039/index.htm
[37] http://www.nationalregister.sc.gov/york/S10817746024/index.htm
[38] http://www.nationalregister.sc.gov/york/S10817746044/index.htm

War I, in 1914,[39] And the list goes on, and on with dozens of more examples, which the court can review on the state's own website displaying such buildings

369. Of the small sampling of just six older buildings cited above, four were constructed over a hundred years ago, and the other two were constructed in the 1930s, one over 90 years ago, and the second over 80 years ago.

370. All in all, approximately 40 buildings are cited on the National Historic Register for York County alone, all being much, much older than the Heritage Tower.

371. Councilman Roddey did not express concerns about "some bones" in any of these buildings, which by American Standards, are relatively ancient compared to the Heritage Tower.

372. Yet, neither Mr. Suskin nor Councilman Roddey, nor anyone else makes an issue about the age, or the decay, or the safety, health, or welfare of the Anderson House, the Allison house, the Old Federal Post Office and Courthouse, the old York County Courthouse, etc, etc, etc.

373. That is because they want to target MorningStar for MorningStar's religious beliefs, and destroy that which is important to MorningStar's religious Mission, the Heritage Tower Which is relatively new compared to many other buildings in York County.

374. This is a typical example of the double standard that the County is employed against MorningStar, using yet another flim-flam excuse while turning a blind eye to much older buildings they should be a much greater concern.

---

[39] http://www.nationalregister.sc.gov/york/S10817746015/index.htm

375. The superstructure of the Tower is complete, it is largely bricked all around except for some break facade which was intentionally removed for testing purposes, and the building has a roof on it.

376. The County's attempt to portray MorningStar's Heritage Tower as old, abandoned, and decayed beyond the normal is disingenuous.

377. There is simply no evidence of decay beyond that which is normal, and the entire issue to try making age of a completed structure that is only 35 years old, and raising phantom safety, health, and welfare issues, is nothing but an attempt to unconstitutionally and improperly undermine MorningStar and its ministry in its desire to undermine the Tower in the eyes of the public.

378. Moreover, if York County were really concerned about the so-called *safety, health, and welfare* of the Tower, it would have not denied MorningStar's building permit request in 2017, which in part, requested permission to remove debris from the property.

379. Thus, the County, on the one hand, raises a professed concern about so-called *safety, health, and welfare,* with regard to the Heritage Tower, yet on the other hand, inconsistently denies a limited building permit request to, in part, to "remove debris," with the removal of debris seemingly something that would improve the so-called *safety, health, and welfare* of the Tower.

380. If the so-called *safety, health, and welfare* of the Tower were really an issue, the County would not have proclaimed, as it did in 2017 "no restoration is allowed" for the building.

381. "Restoration," of course, had that been allowed, would have cured any of the concerns the County might have had about "safety, health, and welfare."

382. But, upon information and belief, and as has become apparent by the County's action, "safety, health, and welfare" was never a legitimate County concern to begin with, but rather, appears to have been a manufactured public ruse to serve as an excuse to attack MorningStar and undermine the ministry's Tower.

383. As proof, the County, ostensibly concerned about "safety, health, and welfare" surrounding the Tower, denied requests for restoration of the Tower.

384. The only thing consistent about the County's ever-changing positions, is the County's inconsistency.

385. The County, on the one hand raises "safety, health, and welfare" concerns, and on the other hand denying permits even to clean up debris.

386. On the one hand the County claims it does not comment on ongoing litigation, but on the other hand making an exception only for MorningStar with a press release full of lies.

387. On the one hand, the County insinuates the building is old and decaying because it's thirty-five years old, but on the other hand the County allows multiple buildings and structures in the County to remain standing, having been built over a hundred years ago.

388. The County then attacks MorningStar, falsely claiming that it has called for a "holy war," all designed to demean MorningStar, and its members, and to interfere with its desire to worship freely by carrying out its religious Mandate of completing the Heritage Tower.

## OTHER FALSEHOODS PUBLISHED WITHIN THE PRESS RELEASE

389.    Unfortunately, the County's Press Release, disseminated by Defendant Suskin, contained numerous other false allegations, largely about the status of previous litigation, all in an effort to undermine MorningStar, its ministry, its members and its sacred Tower.

390.    For example, on page 1 of 5 of that press release, the following statement is made: "MorningStar then proposed entering into a development agreement with York County."

391.    This is a false statement, as the County, not MorningStar, proposed the Development Agreement.

392.     MorningStar officials had never even heard of a development agreement and would not propose such a thing themselves.

393.     MorningStar has challenged the County through FOIA to provide any documentation supporting its claim that MorningStar proposed entering into the agreement, but the County has produced no documentation to support its false claim.

394.     On page 2 of 5, in the next to the last paragraph on that page of the press release, the County conveyed that "the parties submitted a joint stipulation to the court under Rule 40 (j) of the South Carolina Rules of Civil Procedure, which remove the case from the active trial docket for 1 year to allow MorningStar additional time to submit a building permit for completion of a Tower. "

395.    This claim is, at worst, completely false and misleading at best.

396.    While it is true that the parties entered into the joint stipulation to dismiss the original case in state court, *it is not true, as the county falsely claims in the press release, that the joint stipulation contains any language addressing, or contingent upon MorningStar submitting a building permit for completion of a Tower.*

397.    This claim is simply a fabrication to cast MorningStar in a negative light.

**FIRST CAUSE OF ACTION**
**VIOLATION OF 42 USC Section 1983**
**Religious Discrimination and Violation of Equal Protection**
**AS TO DEFENDANTS SUSKIN, RODDEY, YORK COUNTY, AND VARIOUS UNKNOWN DEFENDANTS ASSOCIATED WITH YORK COUNTY, SOUTH CAROLINA**

398.    MorningStar re-alleges and re-incorporates the allegations as set forth above.

399.    The United States Supreme Court, in Masterpiece Cakeshop, Ltd., et al. *v.* Colorado Civil Rights Commission et al, 385 U.S. ___ (2018), has indicated that elements of a clear and impermissible hostility by governmental entities and governmental actors, directed at sincere religious beliefs violates the Establishment Clause of the First Amendment of the United States Constitution.

400.    In Masterpiece, The Court further cited <u>Church of Lukumi Babalu Aye v. City of Hialeah (1993)</u>, for the principle that "The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion."

401.    Demonstrate the hostility toward religion by governments or by government actors, such as the defendant in this case, that does not show neutrality violates the First Amendment.[40]

---

[40] Perlot. V Green, 3:22-cv-00183-DCN (D. Idaho 2022) , https://casetext.com/case/perlot-v-green

78

402.   Unfortunately, the words chosen by Suskin, York County, and Suskin's yet to be named, still unknown Co-Defendants, falsely claiming that MorningStar says it wants a "Holy War," and all the subtle messaging engrained in that slur; accusing MorningStar, a church protected by the First Amendment, of essentially lying by writing false statements, then claiming MorningStar made the false statements, and then calling the statements "false" and "patently false," by suggesting that there are "bones" in MorningStar's Tower, a building that Councilman Roddey knew, or should have known is sacred to MorningStar, by making false claims that all MorningStar's suits have been dismissed, all constitute a plethora of lies and slurs which show a hostility towards, a Religious organization, a Church of Jesus Christ protected by the First Amendment of the United States Constitution.

403.   The Defendants' lack of neutrality and open hostility towards MorningStar is demonstrated by the fact that York County would violate its own policy against not commenting upon matters in litigation, just so they could get after MorningStar and try to launch slurs against MorningStar to degrade MorningStar in the eyes of the public.

404.   By violating York's County's own admitted policy against commenting on pending litigation, the defendants, as outlined above, have chosen platforms of media interviews and the press release of March 16, 2022 to:

(1) Publish an outright falsehood about MorningStar claiming that it wants a "holy war" against the County -- thus publicly disrespecting and subjecting MorningStar's deeply-held practices and deeply-held religious beliefs, and

mocking MorningStar's members by implying that they are extremists and subject to violence;

(2) Publish an outright falsehood in the press release about the status of earlier litigation by claiming all of MorningStar's previous causes of actions had either been dismissed by judges at summary judgment hearings - when the records clearly show, as outlined above, that this claim is not true.

(3) Publish an outright falsehood (Suskin) by claiming, essentially, that MorningStar has never applied for any building permits, when their own press release contradicts this claim by admitting that MorningStar submitted a building permit application in 2017;

(4) Publicly mocking MorningStar and its members (Roddey) by suggesting that there are "bones" within the Heritage Tower, as if there is something rotten within the Tower, after MorningStar has publicly proclaimed on many occasions that it considers the Tower to be sacred, thus showing a callousness and vindictiveness towards MorningStar's members and MorningStar's religious beliefs;

(5)    Using the press release to fabricate issues about the "safety, health and welfare" with the citizens in connection with the Tower - when it has no evidence of any such issues -- while at the same time, hypocritically and contradictorily denying not only the 2017 building permit to remove debris, but making a blanket declaration in 2017 that the County will not approve any work on the Tower -- work that would address any "safety, health and welfare" issues, if any such issues existed;

80

(6) Falsely suggesting in the press release that MorningStar has "never presented evidence that York County has treated differently from others," when in fact, MorningStar had been treated differently on multiple fronts, which MorningStar has made known to the County, including, upon information and belief,

(1) the first and only church ever subjected to Development Agreement By York County,

; (2) the only entity in York County ever to be subject to a demolition clause in a development agreement,

(3) the only builder in the history of York County to be accused of being in "default" on a development agreement,

(4) The only known developer in the history of York County ever to have been denied a building permit request on the basis of " ongoing litigation,"

(5) The only known developer in the history of York County ever to have been denied a building permit request on the basis of " ongoing litigation,"

(6) The only known developer in the history of York County ever to have been denied a building permit request on the basis of "default" in a development agreement, and (7) The only known developer in the history of York County ever to have been denied a building permit request on the basis of a "Planned Development Plan"

(7)    The release was a totally unprovoked act, in response to nothing that MorningStar had said in the media , and was a wanton, malicious, and derelict act of

81

attacking a law abiding church which has been an outstanding citizen in York County for more than two decades.

405. Unfortunately, as shown, and upon information and belief, there are a number of other "firsts" involving MorningStar, which became subjected, uniquely, to the brunt of the County's fury, and obvious anti- religious discrimination on this point.

406. These other examples of disparate treatment, leading to a clear air of religious Hostility against MorningStar by York County, include, but may not necessarily be limited to:

(1) the only instance York County has ever issued a press release against a litigation opponent in the midst of litigation, in violation of his own policy

(2) the only time that York County has ever essentially called and opposing litigant a liar ( see the press release claims accusing MorningStar statements of being "false" and "patently false,"

(3) the only known time that York County has ever published blatant falsehoods about the status of litigation in order to smear a citizen or organization publicly ( falsely claiming that certain Claims brought by MorningStar have been dismissed by summary judgment after hearing, a false claim by the County; falsely claiming that MorningStar phrased it's battle with the County as a "holy war," another false claim by the County )

(4) The only time York County has ever insisted upon negotiated terms into a development agreement whereby a developer would have to forfeit property if certain conditions are not met.

407. The falsehoods, comments, and innuendo, made by York County in it's largely-fraudulent press release, released by the defendant Suskin, and commented upon by the defendant Roddey, reek of hostility toward a religious organization, seeking to complete a Tower as part of a religious mandate.

408. The false-filled press release, in fact, amounts to an unconstitutional assault against MorningStar, a church of Jesus Christ, whose right to free exercise of religion is protected not only by the First Amendment, but at its source is protected as a natural right conferred by the Lord himself.

409. These comments, both individually and collectively, demonstrate an animus against MorningStar, religious organization, and against MorningStar and its Members, which do not comport with the standard of religious neutrality as set forth by the United States Supreme Court in the landmark cases of *Masterpiece Cakeshop* and *Church of the Lukumi Babalu Aye, Inc.,* showing a constitutionally impermissible animus and hostility toward a religious people, namely MorningStar and its members and worshippers in violation of the Free Exercise Clause of the First Amendment of the United States Constitution, and thus in violation of 42 USC § 1983 of the United States Code.

410. The overall pattern of the County's actions as described herein, including the actions of Suskin and Roddey, and Various Unknown Defendants associated with York County South Carolina, demonstrate a public lack of neutrality towards MorningStar's religious beliefs, and a demonstrated animus against MorningStar, because of its religious beliefs.

411. Moreover, the County, by setting a policy of not commenting publicly upon ongoing litigation matters, but then deliberately violating that policy in the case of MorningStar, and not only by violating the policy, but by implementing the violated policy by issuing a press release full of false accusations against MorningStar and designed to undermine MorningStar in the eyes of the public and to undermine the Heritage Tower project in the eyes of the public, has violated MorningStar's right to equal protection under the law under the Fourteenth Amendment to the United States Constitution, and thus, also in violation of 42 USC § 1983 of the United States Code.

412. York County, Suskin, and Roddey, and the unnamed Defendants yet to be determined, deliberately violated York County's own policy against commenting upon litigation, and did so in a manner to carry out an animus against religion, with a press release that was not in any means neutral to religion, but rather, showed repeated extreme hostility toward MorningStar's religious rights and towards MorningStar as religious organization by inventing and publishing false statements about MorningStar, such as accusing it of saying that it wanted a "holy war," and essentially calling it, among other things, a liar, within the context of the defamatory press release.

413. The very fact that the county would violate its own, clearly-stated policy of not commenting upon litigation, to single-handedly violate that "no comment" policy in this case, and then to publish and disseminate and attacking press release against MorningStar, is overwhelming proof of hostility and an anti-religious animus directed toward MorningStar, a Church of Jesus Christ which is protected

84

from such governmental harassment under the first amendment of the United States Constitution.

414. No government, no governmental entity, and no governmental actors can, consistent with the First Amendment, launch a defamatory tirade and attack a church, as Suskin, the County, and various unnamed Defendants associated with the County have done, without violating the Constitution, in a manner in which York County has chosen to attack MorningStar by numerous false statements in its press release of March 16th 2022.

415. Moreover, the conduct and comments by the named defendants Suskin, Roddey, and by the Unnamed Defendants whose actual identity is yet to be determined, constitutes either "evil motive or intent," or displays "reckless or callous indifference to the federally- protected rights of others," namely showing an absolute callousness to MorningStar's right to clear caseous Freedom and equal protection under the law, end entitles MorningStar to receive punitive damages[41] from Suskin and Roddey, and by the Unnamed Defendants whose actual identity is yet to be determined, In an amount to be determined by a jury.

416. By changing its policy of not commenting on litigation to a sudden new policy of commenting, especially carved out for MorningStar and MorningStar alone, to give the County a platform for badgering, haranguing, and pilfering lies about a religious organization, York County not only violated the Equal Protection Clause

---

[41] The U.S. Supreme Court has determined that punitive damages may be awarded, in an amount to be determined by a jury, upon a violation by an individual state actor. nst an official personally, see Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). A plaintiff may recover **punitive damages** even without an award for compensatory damages. "Sahagian v. Dickey , 827 F.2d 90, 100 (7th Cir. 1987) ; McKinley v. Trattles , 732 F.2d 1320, 1326 (7th Cir. 1984),..." Lunsford v. Shy, 842 S.E.2d 728 (W. Va. 2020)

of the United States Constitution, but moreover, by creating a new policy to attack a church in a public forum, York County abandoned all pretentiousness of neutrality toward religion and violated MorningStar's constitutionally-protected right of free exercise of religion under the First Amendment of the United States Constitution.

417.    By its new policy of suddenly publicly commenting upon litigation matters, aimed solely at Morningstar and Morningstar alone, York County manufactured and constructed an unconstitutional platform and an unconstitutional policy, in violation of the First Amendment, to give itself a bullhorn for broadcasting falsities about a religious organization in America namely, the plaintiff, MorningStar Fellowship Church.

**SECOND CAUSE OF ACTION**
**CONSPIRACY TO VIOLATE CIVIL RIGHTS**
**42 USC. §1985**

**AS TO DEFENDANTS SUSKIN, RODDEY, YORK COUNTY &**
**VARIOUS UNKNOWN DEFENDANTS, ASSOCIATED WITH**
**YORK COUNTY, SOUTH CAROLINA**

418.    MorningStar re-alleges and re-incorporates the allegations as set forth above.

419.    28 U.S. Code § 1985 (3) prohibits state-party-actors from conspiring together to engage in unconstitutional religious discrimination against another group or citizen.[42]

---

[42] 165 Marlowe v. Fisher Body, 489 F.2d 1057 (6th Cir. 1973). The Marlowe upheld a claim brought under section 1985(3) that alleged religious discrimination. the Fourth Circuit has determined that §**1985** extends to **religious discrimination** as well. See Ward v. Conner, 657 F.2d 45, 49 (4th Cir. 1981) (finding Plaintiff had asserted a viable complaint under §**1985 for religious discrimination**).

420. In the allegations as shown above It appears, upon information and belief, Mr. Suskin, and Various Unknown Defendants, associated with York County, South Carolina, joined together with Mr. Suskin to coordinate in the preparation of and the publication of the defamatory press release in question.

421. Suskin's actions appear to be coordinated as part of governmental policy, involving others, meaning that he appears not to have been acting outside the scope and course of his employment, but rather, within it.

422. The coordination appears evident from the words of the Defendant Suskin himself.

423. For example, in his interview with Mr. Dellinger, Mr. Suskin said, "Our County staff, our legal team, thought that it was appropriate to, sort of, remind people where this has been, where it started, where it is now."[43]

424. **Thus, Mr. Suskin points to the "**County staff," and the County "legal team" as having been involved, in some way, in the press release.

425. "Qcnews.com" quoted Suskin as saying, "Typically with pending litigation, it's not something we generally speak about. But with the public comments, we felt it was appropriate to show how it started, where it's going, and where it is now."[44]

426. Moreover, it is not only Mr. Suskin who suggests that his actions regarding the press release may not have been alone, but may be the product of a coordinated tortious strategy by the County.

---

[43] Greg Suskin Interview QC News published March 16,2022, see video beginning at 148 mark
https://www.qcnews.com/news/local-news/new-phase-in-the-fight-of-decaying-heritage-Tower/?ipid=promo-link-block1
[44] Greg Suskin Interview QC News published March 16,2022.
https://www.qcnews.com/news/local-news/new-phase-in-the-fight-of-decaying-heritage-Tower/?ipid=promo-link-block1

427.   In an effort to determine parties involved with the press release prior to its issuance, MorningStar submitted the following requests via FOIA on March 17, 2022.

1.  All correspondence, notes, emails, electronic communications, containing any information concerning the discussion of the press release, either prior to or after its issuance.

2.  Specifically, all correspondence, notes, emails, electronic communications, containing any information concerning the discussion of the press release, from or to York County employees and ostensible County spokesperson Greg Suskin, either prior to or after the issuance of the press release.

428.   To these requests, the County responded as follows:

Your first request for information is exempt from disclosure under FOIA and is protected by the attorney-client privilege and work-product doctrine and/or does not exist; therefore, the request is denied.

Your second request for information is exempt from disclosure under FOIA and is protected by the attorney-client privilege and work-product doctrine and/or does not exist; therefore, the request is denied.

429.   Thus, Mr. Suskin, in his public response has pointed to County "staff and legal team" as being involved in the press release, and the County's FOIA request has cited the "attorney-client privilege and work product doctrine," corroborating Suskin's public comments suggesting that the County's legal team may have been behind the false press release.

430.   All this -- Suskin's comments and the County's FOIA response on the question of involvement in the press release -- points to a coordinated effort, involving

possibly unnamed defendants, potentially within the County Staff and the County Legal Team, and suggests that the false contents of the press release are, unfortunately, the result of coordinated County policy, suggesting that Suskin's actions, in this case, in publishing the false press release, *were part of a conspiracy with other actors,* namely, the Various Unknown Defendants associated with York County South Carolina, to deprived the plaintiff of his constitutional rights as outlined above*.*

431. Roddey's religiously-insulting comments about "bones" in the building also coordinate with the county's disingenuous attempt to suggest undocumented "safety, health and welfare" issues with the Tower.

432. In working together as alleged above, to conceive, draft and publish the defamatory press release, Mr. Suskin, Councilman Roddey, and Various Unknown Defendants, associated with York County, South Carolina, conspired together, and did violate the constitutional rights of the plaintiff to free exercise of religion, under the First Amendment of the United States Constitution, by the anti-religious, defamatory, and hostile tone of the press release, and also violated the plaintiff's right to equal protection of the law, under the Fourteenth Amendment of the United States Constitution, by violating and ignoring the County's own admitted and establish policy against active matters of litigation.

**THIRD CAUSE OF ACTION**

**42 U.S. § 2000a–1**
**PROHIBITION AGAINST DISCRIMINATION**
**REQUIRED BY ANY LAW, STATUTE, ORDINANCE, REGULATION,**
**RULE OR ORDER OF A STATE OR STATE AGENCY**

**AS TO DEFENDANTS SUSKIN, YORK COUNTY &
VARIOUS UNKNOWN DEFENDANTS, ASSOCIATED WITH
YORK COUNTY, SOUTH CAROLINA**

433.    MorningStar re-alleges and re-incorporates the allegations as set forth above.

434.    42 U.S. Code § 2000a–1 prohibits discrimination under any law, statute, ordinance, regulation, rule or order of a state or state agency.

435.    Upon information and belief, and based upon the allegations are set for above, and based upon circumstantial evidence flowing therefore, some unknown Defendant or Defendants within the York County Government issued an order to publish the defamatory and constitutionally impermissible press release as described in detail above.

436.    The issuance of that order, and the subsequent execution of that order through the dissemination of the Press Release by Defendant Suskin, violated Plaintiff's rights to the Free Exercise of Religion guaranteed under the First Amendment of the United States Constitution, and also violated link its rights to equal protection under the Fourteenth Amendment of the United States Constitution.

437.    As a result of the County's violation, MorningStar is entitled to injunctive relief and attorney's fees as may be appropriate under the auspices of this title.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF THE SOUTH CAROLINA TORT CLAIMS ACT
S.C. Code Annotated §15-78-10, et seq.
Defamation Per Se
AS TO DEFENDANTS SUSKIN, YORK COUNTY, &
VARIOUS UNKNOWN DEFENDANTS, ASSOCIATED WITH
YORK COUNTY, SOUTH CAROLINA**

90

438.   MorningStar re-alleges and re-incorporates the allegations as set forth above.

439.   28 U.S. Code § 1367, allows the court to hear supplemental state claims, which would include supplemental state claims under the South Carolina Tort Claims Act, located at S.C. Code Annotated §15-78-10, et seq.

440.   The South Carolina Tort Claims Act (The Tort Claims Act) holds government employees and officials liable for their actions in circumstances where an individual is injured.

441.   Under the Tort Claims Act, an agency, a political subdivision, or a governmental entity is liable for their actions in circumstances where an individual is injured.

442.   Ordinarily, when in an individual employee engages in conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude, the governmental entity would not be responsible, or would not be considered to a wave sovereign immunity under SECTION 15-78-60 of the Tort Claims Act.

443.    However, in this case, Suskin's actions, upon information and belief, appear to be coordinated as part of governmental policy, involving others, meaning that he appears not to have been acting outside the scope and course of his employment.

444.   For example, "In his interview with Mr. Dellinger, Mr. Suskin said, "Our County staff, our legal team, thought that it was appropriate to, sort of, remind people where this has been, where it started, where it is now."[45]

---

[45] Greg Suskin Interview QC News published March 16,2022, see video beginning at 148 mark https://www.qcnews.com/news/local-news/new-phase-in-the-fight-of-decaying-heritage-Tower/?ipid=promo-link-block1

445. Thus, Mr. Suskin points to the **"County staff,"** and the County "legal team" as having been involved, in some way, in the press release.

446. "Qcnews.com" quoted Mr. Suskin, as saying, "Typically with pending litigation, it's not something we generally speak about. But with the public comments, we felt it was appropriate to show how it started, where it's going, and where it is now."[46]

447. Moreover, it is not only Mr. Suskin who suggests that his actions may not have been alone, but may be the product of a coordinated tortious strategy by the County.

448. To determine all the County actors behind the press release, MorningStar submitted the following requests via FOIA on March 17, 2022.

1. All correspondence, notes, emails, electronic communications, containing any information concerning the discussion of the press release, either prior to or after its issuance.

2. Specifically, all correspondence, notes, emails, electronic communications, containing any information concerning the discussion of the press release, from or to York County employees and ostensible County spokesperson Greg Suskin, either prior to or after the issuance of the press release.

449. To these requests, the County responded as follows:

---

[46] Greg Suskin Interview QC News published March 16, 2022.
https://www.qcnews.com/news/local-news/new-phase-in-the-fight-of-decaying-heritage-Tower/?ipid=promo-link-block1

Your first request for information is exempt from disclosure under FOIA and is protected by the attorney-client privilege and work-product doctrine and/or does not exist; therefore, the request is denied.

Your second request for information is exempt from disclosure under FOIA and is protected by the attorney-client privilege and work-product doctrine and/or does not exist; therefore, the request is denied.

450.   Thus, Mr. Suskin, in his public response has pointed to County "staff and legal team" as being involved in the press release, and the County's FOIA request has cited the "attorney-client privilege and work product doctrine," corroborating Suskin's public comments suggesting that the County's legal team may have been behind the false press release.

451.   All this -- Suskin's comments and the County's FOIA response on the question of involvement in the press release -- points to a coordinated effort, involving possibly unnamed defendants, potentially within the County Staff and the County Legal Team, and suggests that the false contents of the press release are, unfortunately, the result of coordinated County policy, suggesting that Suskin's actions, in this case, in publishing the false press release, *may have been within his official duties*.

452.   York County, upon information and belief, by the coordination of certain County employees and officers, working alongside Mr. Suskin, including possibly even the County's own legal staff, as suggested by Mr. Suskin himself and in the County's response to FOIA requests, has engaged in a coordinated policy of defamatory innuendo, and direct defamation, involving heretofore unnamed and unknown York County staff members against MorningStar through its press

release, as outlined above, and by the public comments of its officials, as outlined above.

453. Moreover, by spreading and propagating outright false accusations to thousands if not hundreds of thousands of people against MorningStar, including the false claim that MorningStar has said it wants a "holy war," and the false claims that County-invented statements attributable to MorningStar are "false" and "patently false," Suskin and the County have not only violated 42 USC § 1983, as specifically outlined above, by attacking the integrity of a church, and thus attacking the church's ministry, but have also engaged in defamation.

454. The South Carolina Court of Appeals has said that, "Even '[a] mere insinuation is actionable as a positive assertion if it is false and malicious and its meaning is plain.' ' Id . (quoting Murray v. Holnam, Inc. , 344 S.C. 129, 139, 542 S.E.2d 743, 748 (Ct. App. 2001) )." Paradis v. Charleston Cnty. Sch. Dist., 424 S.C. 603, 819 S.E.2d 147 (S.C. App. 2018) **https://bityl.co/EvHU**.

455. York County has insinuated, by disseminating concerns about the "health, safety and welfare" of the tower, without evidence that there is an issue in any of these areas.

456. But in other false allegations, the County's barrage against MorningStar has gone beyond insinuation, by the falsely propagated "holy war" statement, and by claiming MorningStar's statements to be "false," and "patently false," among others.

457. False statements made by the County, such as "MorningStar's attempts to characterize its dispute with the County as a 'holy war,'" falls within this category,

as being not only false and malicious, but full of insinuation, that is that MorningStar members are "extremists" and possibly prone to violence.

458.  Accusing MorningStar of making statements that are "false" (after the County manufactured the false statement that it accuses MorningStar of being "false" about) and "patently false," being not only false and malicious, but full of insinuation, that the ministry is somehow dishonest or untruthful in its affairs.

## LIBEL *PER SE* UNDER THE TORT CLAIMS ACT

459.  Defamation *per se* occurs in South Carolina when the defendant's defamatory statements charge the plaintiff with one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) *unfitness in one's business or profession.* (Emphasis added). Holtzscheiter v. Thomson Newspapers, Inc., 332 S.C. 502, 511, 506 S.E.2d 497, 502 (1998).

460.  In a defamation action that is actionable per se, general damages are presumed and need not be proven by the plaintiff. Constant v. Spartanburg Steel Prods., Inc., 316 S.C. 86, 447 S.E.2d 194, cert. denied, 513 U.S. 1017 (1994).

461.  In this case, the defendant's defamation against MorningStar falls in category five of the categories under which Defamation per se is actionable, namely (5) unfitness in one's business or profession.

462.  Because MorningStar is a church, dependent upon its reputation for organization truthfulness, Suskin, Various Unknown Defendants associated with York County

95

South Carolina, and the County, have committed defamation per se against MorningStar, and should be held liable under the South Carolina Tort Claims Act.

## FIFTH CAUSE OF ACTION

### COMMON LAW DEFAMATION
### (DEFAMATION PER SE)
### AS TO DEFENDANTS SUSKIN, YORK COUNTY, &
### VARIOUS UNKNOWN DEFENDANTS, ASSOCIATED WITH
### YORK COUNTY, SOUTH CAROLINA

463.   MorningStar re-alleges and re-incorporates the allegations as set forth above.

464.   28 U.S. Code § 1367 allows the court to hear supplemental state claims, particularly Including common law causes of actions defamation and a particular, defamation per se.

465.   The defendants, by their actions above, in, among other things, manufacturing false statements attributable MorningStar (the "false" and "patently false") statements, the prevarication stating are claiming that MorningStar has characterized his dispute with the County as a "holy war," with all these false statements having been manufactured with malice, has not only committed defamation against MorningStar, but has committed defamation per se, because the very nature of the defamatory statements serve as an attempt to characterize MorningStar as being unfit in its business or profession.

466.   The court should enter an award of punitive damages against all the individual defendants, those named, and those yet to be specifically named, for each of their parts in the defamation of MorningStar.

**WHEREFORE, THE PLAINTIFF, MORNINGSTAR FELLOWSHIP CHURCH, PRAYS OF THE COURT AS FOLLOWS:**

1.  For an order and judgment favoring the plaintiff on all causes of action;

2.  For an equitable order against York County preventing the County from further religious discrimination against MorningStar, Implementing training and procedures to train County employees, officers, and elected officials, to be sensitive to and to avoid engaging in insensitive acts of religious discrimination against churches and other believers who are entitled to strict protection under the First Amendment protection under the First Amendment, in accordance with the guidelines of **Masterpiece Cakeshop v. Colorado Civil Rights Commission 585 US ___ (2018)**, *Church of Lukumi Babalu Aye v. City of Hialeah* (1993), In other cases as the court deems fitting and proper;

3.  For an equitable order requiring York County to issue a retraction of all the points proven to be false in the press release;

4.  For an award of consequential damages may be determined by a jury;

5.  For an award of punitive damages against the defendants Suskin and Roddey, and Various Unknown Defendants associated with York County South Carolina, Under 42 U.S.C. Section 1983 of the Civil Rights Act, under the SouthCarolina Tort Claims Act, and under the cause of action for common law defamation;

6.  For an award of attorneys fees under the Federal Civil Rights Acts as cited herein, under 42 U.S.C. § 1988, and under the South Carolina Tort Claims Act;

7.  For a trial by jury on the merits of this action;

8.      For such other and further relief, at the court, in his great wisdom and discretion, deems to be just and proper.


This is the 11th day of October, IN THE YEAR OF OUR LORD, 2022, and of the

Independence of the United States of America, the two hundred forty-third.


/S/Donald M. Brown, Jr.
Donald M. Brown, Jr.
    SC Bar Number 9902
    NC Bar Number 14178
    Federal ID Number 6307
    brownandassociatespllc@gmail.com
    don@brownattorneys.com
Park South Professional Center
10440 Park Road, Suite 200
Charlotte, North Carolina 28210
(704) 542-2525
(704) 541-4751 (fax)
*Attorney for Plaintiff*
*MorningStar Fellowship Church*

**STATE OF SOUTH CAROLINA**

**COUNTY OF YORK**

Dave Yarnes, in his capacity as Vice President of MorningStar Fellowship Church, being first duly sworn, deposes and says:

That he is the Plaintiff's duly-appointed representative in the foregoing action, that he has authority to review and verify this complaint on behalf of the plaintiff; that he has reviewed the attached Complaint and knows the contents thereof, and that the same is true of his own knowledge, except as to those matters and things therein stated upon information and belief, and as to those matters and things, he believes them to be true.

Dave Yarnes, Vice President
MorningStar Fellowship Church

Sworn to and subscribed before me
this the __1 ST__ day of November, 2022.

Notary Public York County, South Carolina

My commission expires: 01-22-2025